### In re GIC GOVERNMENT SECURITIES, INC.
### Debtor.

**No. 85–2784–BKC–8P7.**

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

Oct. 28, 1988.

George Hadley, trustee.

Hywel Leonard, Tampa, Fla., for trustee.

Raymond C. Farfante, Jr., Tampa, Fla., for Labozzetta.

Phillip M. Hudson III, Miami, Fla., for Schantz, Schatzman, Aaronson & Berlin.

Neal R. Sonnett, Miami, Fla., for Berlin.

## ORDER ON TRUSTEE'S MOTION TO EXAMINE DEBTOR'S TRANSACTIONS WITH ATTORNEYS

ALEXANDER L. PASKAY, Chief Judge.

THIS IS a stockholder liquidation case under sub-Chapter III of Chapter 7 of the Bankruptcy Code. The matter under consideration is a proceeding instituted by George Hadley (Trustee), who seeks a re-examination of fees paid to the law firm of Labozzetta and Hass, P.A., a New York law firm, and/or to Anthony Labozzetta and to Jerome Berlin (Berlin), an attorney who is maintaining his offices in Miami, Florida, collectively referred to as attorneys. The examination sought by the Trustee is pursuant to § 329(b) of the Bankruptcy Code and Bankruptcy Rule 2017. The Trustee seeks a reconsideration by this Court of the reasonableness of the amounts paid by GIC Government Securities, Inc. (GIC), to the attorneys within one year immediately preceding the commencement of the bankruptcy case in contemplation of bankruptcy and to the extent the amounts paid are found to be in excess of the reasonable amount, also seeks an order directing a refund of the excessive amount to the estate.

Neither Labozetta nor Berlin disputes that they did, in fact, receive the payments sought to be re-examined by the Trustee nor do they dispute that they were paid by GIC during the one year immediately preceding the filing date of the original Petition, i.e., October 5, 1985. It is their contention, however, that these fees were not paid to them for representing GIC in a bankruptcy case or in connection with a bankruptcy case, and more importantly, they were not paid by GIC "in contemplation of bankruptcy". Therefore, they so contend, the reasonableness of the fees they received is not subject to re-examination pursuant to § 329(b) of the Bankruptcy Code or Bankruptcy Rule 2017.

It is without dispute that neither Labozetta or Labozetta and Hass, P.A., nor Berlin represented GIC in the bankruptcy case or in connection with the bankruptcy case. This leaves for consideration their contention that the fees paid GIC were not paid "in contemplation" of bankruptcy, therefore not subject to re-examination by the Trustee.

Inasmuch as this contention raises an important threshold issue, it was agreed by all parties that any consideration of the reasonableness of the amounts they have received should be deferred pending a resolution of this issue, that is, whether or not these payments were in fact made "in contemplation of" bankruptcy.

To place this issue into proper focus and perspective, a brief historical review of the facts as they appear from the record, established at the final evidentiary hearing, should be helpful and can be summarized as follows:

Events Leading Up To Bankruptcy

GIC is a Tennessee corporation and is a successor in interest of J.E. Evans & Co. (Evans), also a Tennessee corporation. Both Evans and GIC were engaged in selling securities to the public at large. Sometime in early 1983, John Kilpatrick became the sole shareholder and principal officer of GIC. In May 1983, the Securities Division of the Department of Commerce and Insurance of the State of Tennessee instituted an administrative procedure against GIC and sought a revocation of its registration as an authorized dealer in securities. Labozetta, who was the general counsel of GIC represented GIC in these proceedings. The Tennessee proceedings ultimately culminated in the entry of an order revoking GIC's registration in Tennessee, based on numerous and sundry securities violations. While this order was appealed by GIC, but since GIC did not seek a renewal of its Tennessee registration, the appeal became moot and it was ultimately dismissed.

On December 1, 1984, John Kilpatrick entered into an agreement with Lonnie Kilpatrick, his brother, for the sale of all the outstanding shares in GIC to Lonnie Kilpatrick. Pursuant to the agreement, the transaction was consummated, and Lonnie Kilpatrick became the sole stockholder in GIC and the chief executive officer of GIC and acted as such at least until the commencement of the bankruptcy case (Exhibit No. 12 to the Deposition of Anthony V. Labozetta).

Initially GIC maintained offices in Tennessee, but after its troubles started with the State of Tennessee, it gradually transferred its entire operation to Tampa, Florida. GIC was licensed by the State of Florida to operate as a securities dealer in government securities initially on June 8, 1982, and later on July 3, 1984, when Lonnie Kilpatrick himself was individually authorized as a dealer in securities.

On April 9, 1985, Gerald Lewis, Comptroller of the State of Florida (Comptroller), filed administrative charges and a complaint against GIC (Trustee's Exhibit No. 5). The Comptroller sought to suspend the registration of GIC to act as a dealer in government securities based on the alleged failure of GIC to comply with several provisions of the Florida Securities and Investors Protection Act (Chapter 517, et seq., Fla.Stat.).

On June 24, 1985, GIC entered into a stipulation and consented to the entry of an order. According to the consent order, Lonnie Kilpatrick on behalf of GIC agreed, inter alia, not to sell any unregistered securities; agreed to maintain accurate records of all sales and agreed not to violate any provisions of the Florida Administrative Code related to regulation of sales of securities. The crucial part of the consent order is set forth in Paragraph 5. It provided that GIC agreed to refund to the investors in trust notes $5,000,000 by June 1; $4,000,000 by August 1; $600,000 by September 1; $400,000 by October 1; and by November 1 redeem all trust notes and complete the total liquidation of the treasury note trusts. In Paragraph 8 of the consent order, GIC agreed that in the event it failed to comply with any provisions of the consent order and with the terms of the stipulation, the Comptroller may revoke its registration as a securities dealer without prior notice and a hearing (Exhibit No. 10 to Deposition of Anthony V. Labozetta).

The balance sheet prepared by the firm of Arthur D. Levy & Co., Certified Public Accountants (Exhibit No. 41 to Deposition of Anthony V. Labozetta), indicated that as of December 31, 1984, GIC showed a net stockholders equity in the amount of $231,498.00. It should be noted, however, that the balance sheet was not an audited balance sheet and its accuracy was disclaimed by Mr. Levy. The next balance sheet in evidence was prepared by the auditing firm of Hartman and Hartman. This was again an unaudited balance sheet and showed a net stockholders equity in the amount of $473,068.38 as of April 30, 1985. It should be noted again that the accuracy of this statement was not vouchsafed by the accounting firm. On the contrary, there is a very strong disclaimer in the letter of transmittal stating that "management has elected to omit substantially all of the disclosures and the statement of changes in

financial position required by generally accepted accounting principles." (Exhibit No. 48 to Deposition of Anthony v. Labozetta). More importantly, the balance sheet included as assets accounts receivable from employees and from stockholders whose collectibility was highly questionable. Based on the foregoing, the claimed net stockholders equity of $473,068.38 hardly reflected the real financial status of GIC as of April 30, 1985.

It appears that GIC did meet its obligations initially under the stipulation and the consent order and made refunds to investors. However, it soon became apparent that it would not be able to live up to the terms of the consent order due to the lack of sufficient funds unless 1) it was able either to raise funds through the sale of securities or, 2) through possible liquidation of its real estate holdings or, 3) somehow to prevail on the office of the Comptroller to waive the provisions of the stipulation and the consent order and obtain an agreement to a moratorium allowing GIC to restructure the repayment schedule and to give GIC more time to generate the funds necessary to live up to its commitment to repay the investors in the trust notes. There is no question that GIC did not have the funds to meet the payment schedules by the summer of 1985. It is equally without dispute that under no conditions could GIC have liquidated its real estate holdings in time to generate funds sufficient to meet its obligations under the consent order. This is so because, according to Lonnie Kilpatrick, the values placed on the real properties owned by GIC were not only grossly inflated, but the real estate market in central Florida was depressed and the market was saturated with properties offered for sale (Deposition of Lonnie Kilpatrick at page 72, line 24). The untenable situation of GIC was further aggravated by the fact that GIC was not in a position to raise funds through the sale of securities unless 1) it was successful to obtain registration of a new issue it attempted to market or, 2) it embarked again on selling unregistered securities. All efforts by Labozetta to register a new issue with the Securities Exchange Commission failed. This, of course, left no alternative to GIC except either to resume the sale of unregistered securities, or somehow prevail on the Comptroller to leave GIC alone.

The record reveals that Lonnie Kilpatrick decided the first alternative, which, of course, in no time came to the attention of the office of the Comptroller who intensified its investigation of the affairs of GIC. The sale of unregistered securities was a patent violation of the consent order and would have automatically triggered a revocation of GIC's registration as a dealer in government securities which in turn would have put GIC out of business at once and would have destroyed its economic life. This fact was well known to Lonnie Kilpatrick and, in spite of his protestation that he did not intend ever to consider bankruptcy and hoped without any realistic basis to escape bankruptcy, this fact was clearly evident or should have been evident to anyone familiar with the affairs of GIC by late August 1985. By that time, it appeared that the choices available to GIC were limited and unless GIC was able to obtain a moratorium on its obligation under the consent decree, the impending doom appeared to be inevitable and unless it was able to obtain relief in the Bankruptcy Court and to avail itself of the protection accorded to the Debtor by § 362(a), i.e. the automatic stay, its operation would be shut down by the Comptroller and GIC would be put out of business.

### Fees Paid to Labozetta and Berlin

It should be noted at the outset that the record established in these proceedings concerning the fees paid to Labozetta, or Labozetta and Hass, P.A., and Berlin is not to be noted for clarity and leaves a lot to be desired. According to the submission of Berlin, he received the following amounts on the following dates for the following purposes:

| April 18, 1985 | $ 50,000.00 | representation of GIC in |
| May 10, 1985 | 3,500.00 | Florida proceedings |
| July 8, 1985 | 12,500.00 | representation of GIC in |
| July 17, 1985 | 850.00 | Tennessee appeal |
| August 20, 1985 | 12,500.00 | |
| September 11, 1985 | 6,000.00 | |
| October 1, 1985 | 50,000.00 | attempt to stop state of Florida from entering fi- |

| | |
|---|---|
| | nal Order of Revocation of GIC's registration |
| TOTAL: | $135,250.00 |

While Berlin did not testify, the documentary evidence in the deposition of Lonnie Kilpatrick does not support the data submitted by Berlin concerning the fees received by him and indicates that on August 25, 1985 GIC made out a check to Berlin for $25,000 while Berlin's Disclosure reveals that he received $12,500 from GIC on that date.

Labozetta's Disclosure Statement reveals the following payments:

| | | |
|---|---|---|
| October 4, 1984—October 3, 1985 | $ 2,000.00 | per month as retainer for general counseling |
| | 2,500.00 | advised transfer of ownership of shares in GIC of shares in GIC from John to Lonnie Kilpatrick |
| | 65,000.00 | as co-counsel with Berlin for representation of GIC in connection with State of Florida revocation proceedings |
| | 2,500.00 | for negotiations and settlement with State of Florida |
| | 30,000.00 | in his efforts for appeal of State of Tennessee's Revocation order |
| | 25,000.00 | filing of Government trust offering with Securities Exchange Commission |
| | 5,000.00 | for proposed purchase of Jupiter Plaza and Forest Hill Plaza |
| | 35,000.00 | for work in connection with acquisition of Kimberly Property |
| | 2,500.00 | State of Florida v. Robert Turner |
| | 7,500.00 | acquisition of Westshore Property |
| | 50,000.00 | for efforts in attempting to forestall State of Florida from entering Final Order of Revocation |

However, at the hearing on the Trustee's Motion to Re-examine Fees, Labozetta testified to the following schedule of payments received by him:

| | | |
|---|---|---|
| July, 1985 | $12,500.00 | trust offering |
| August, 1985 | 12,500.00 | securities registration with Securities Exchange Commission |
| October, 1984 | 35,000.00 | Kimberly Property acquisition |
| July, 1985 | 30,000.00 | Tennessee proceedings (appeal) |
| October, 1984—October, 1985 | 2,000.00 | per month retainer |

Ordinarily, one would incline to dismiss the Trustee's attempt to obtain re-examination of the fees of Labozetta and Berlin based on the total failure of the Trustee to present at least an understandable picture of the facts relevant, albeit rough, which may form the basis for re-examination. It is astounding indeed that a trustee who has engaged the services of Control Associates, a New York securities specialist firm at the very early stage of the administration of the estate of GIC, and the estate so far paid to this firm fees and expenses in excess of $467,777.26 and which firm again has currently an application pending for interim allowance and seeks an additional payment of fees in the amount of $172,-155.00 and reimbursement of expenses in the amount of $42,779.17, failed to present any documentation, e.g., at least cancelled checks to show precisely what amounts Labozetta and Berlin received and when. Nevertheless, this Court is duty bound regardless of the Trustee's failure to proceed and examine the issues raised and re-examine, if appropriate, the reasonableness of the fees paid by GIC to Labozetta and Berlin.

### Basis for Reconsideration of Fees Pursuant to § 329 and Bankruptcy Rule 2017

The jurisdiction of the Bankruptcy Court to re-examine the reasonableness of payments or transfers of properties by a debtor to an attorney in contemplation of bankruptcy is not new. Prior to the enactment of the Bankruptcy Code, § 60(d) of the Bankruptcy Act of 1898 specifically authorized the Court, even on its own motion, to re-examine payments made or properties transferred by a debtor to an attorney in contemplation of bankruptcy. This Section also authorized the trustee of the estate to recover the amounts found to be in excess of the reasonable fee. As stated by the Supreme Court in the landmark case interpreting this Section, *Conrad, Rubin & Lesser v. Pender*, 289 U.S. 472, 53 S.Ct. 703, 77 L.Ed. 1327 (1933) that:

> "the manifest purpose of the provision is to safeguard the assets of those who are acting in contemplation of bankruptcy, so that these assets may be brought quickly and without unnecessary expense into the hands of the trustee, and to provide a restraint upon opportunities to make an unreasonable disposition of property through arrangement for excessive payments for prospective legal services."

Viewing the language of § 329 in isolation, it might appear at first blush that the concept "in contemplation of" has been eliminated by Congress and the authority to re-examine was limited to payments made to an attorney who actually represented the debtor in a case under Title 11 or who represented the debtor in connection with such case. However, reading Bankruptcy Rule 2017 leaves no doubt that this was not the Congressional intent and the scope and the reach of the power to re-examine payments made or properties transferred by a debtor to his attorney is the same as it existed prior to the adoption of the Code. From this, it follows that the principles enunciated by pre-Code cases interpreting § 60(d) of the Bankruptcy Act of 1898 are still controlling.

Both Labozetta and Berlin rely on *Conrad, Lesser, supra,* for the proposition that the controlling question is whether or not bankruptcy was the impelling cause of the transaction. As noted earlier, in opposing the position of the attorneys, and in support of his contention, the Trustee heavily relies on the fact that GIC was insolvent during the relevant period, i.e., during the one year immediately preceding the actual filing of the case originally under Chapter 11 which later on was converted to a Chapter 7 case on October 3, 1985.

A close analysis of *Conrad, Rubin & Lesser, supra,* and the cases cited by the Supreme Court in that case, leaves no doubt that the arguments and the facts relied on by both Labozetta and Berlin and counsel for the Trustee miss the mark. As noted, Labozetta and Berlin point out that the record is clear, and it is without dispute that Lonnie Kilpatrick, the President of GIC who is currently an involuntary guest of the Federal Government, consistently maintained in his deposition that he did not intend to file bankruptcy on behalf of GIC. Thus, seizing on the language in *Conrad, Rubin & Lesser,* quoted earlier, Labozetta and Berlin contend that the payments made to them were not in contemplation of bankruptcy and, therefore, this Court lacks the power to re-examine the reasonableness of the amounts paid by them to GIC.

Construing the term "in contemplation" in general, the Supreme Court stated that one is usually very much in contemplation of the very result he wants to avoid, and when engages services of an attorney to accomplish this goal, is making payments in "contemplation". This was precisely the factual scenario in *Conrad, Rubin & Lesser, supra,* where the attorneys were hired for the purpose of negotiating a settlement with creditors of a 50% cash settlement and to help the debtor corporation to pledge its accounts receivable in order to obtain the necessary funds to carry out the settlement and to avoid bankruptcy.

Considering the proposition urged by the Trustee, which basically focuses on the alleged insolvency of GIC at the time relevant, it is well to state that the financial condition of GIC without anything further carries little relevance, if any, to the issue under consideration. In support of his contention that the above payments were made by GIC to the attorneys in contemplation of bankruptcy, the Trustee primarily relies on the alleged fact that one year prior to the filing of its Petition for Relief under Chapter 11, GIC was insolvent therefore the payments were made "in contemplation of bankruptcy". In support of this proposition, the Trustee introduced into evidence the testimony of James Foley, President of Control Associates, a securities analyst firm, who concluded through an analysis of GIC's financial records that GIC was insolvent as of December 1985. The Trustee further contends that the principals of GIC were very well aware of this fact; that they knew that GIC was selling securities it had never purchased and knew that the real properties purchased and owned by GIC were grossly overvalued and did not represent sufficient value to change the position of GIC from insolvency to solvency. Assuming that the evidence supports the Trustee's contention on the issue of insolvency, this is really of no relevance itself because in the context of the matter under consideration, the accuracy of the financial date presented by the two balance sheets are really of no consequence. This is so because it is the subjective frame of mind of Lonnie Kilpatrick at the time which

has the only relevance to the issue under consideration, and not an objective determination by hindsight that during the year 1985, GIC was already insolvent. As noted in the case of *Tripp v. Mitschrich*, 211 F. 424 (8th C.C.A.1914), the Eighth Circuit stated that:

> "the words 'in contemplation of bankruptcy ...' means more than a simple consciousness of insolvency ... A man may be insolvent and yet not contemplate bankruptcy ... He may contemplate insolvency and the breaking up of his business and yet not contemplate bankruptcy. Contemplation ... means that in making the transfer the debtor is influenced by the possibility or imminence of a ... bankruptcy proceeding."

The subjective state of mind of Lonnie Kilpatrick is further fortified by the undisputed evidence that during 1985, GIC was continuing to attempt to purchase numerous and sundry real properties, i.e., the property known as the Kimberly Property in Palm Beach; property known as Jupiter Plaza and Forestville Plaza; and property known as the West Shore Property in Tampa, Florida. Clearly, these undisputed facts hardly support the subjective frame of mind of one who already contemplates filing bankruptcy simply because ordinarily one who contemplated to seek relief in bankruptcy court liquidates assets rather than attempts to acquire them. Nevertheless, whether or not Lonnie Kilpatrick in fact actually contemplated during 1985, as contended by the Trustee, to seek relief in a bankruptcy court is not really significant. The real consideration and the one that must be supported by the record is whether or not the fees paid to the attorneys were paid for the services of seeking relief in the Bankruptcy Court or for the purpose of avoiding bankruptcy, thus clearly "in contemplation of bankruptcy".

### Fees Paid to Labozetta

■ The record reveals that Labozetta received $2,000 a month retainer from GIC prior to Lonnie Kilpatrick's having acquired controlling interest in GIC and continued to receive the same possibly up to and including October 1985, the month GIC filed its original Petition for Relief in this Court. It appears that additional fees paid to Labozetta or to his firm during the spring and summer of 1985 were either in connection with attempted acquisition of real properties by GIC or with his attempt to obtain a registration for a trust offering by GIC, the sale of which would have possibly enabled GIC to generate enough funds to keep its commitment to the State of Florida under the terms of the consent order entered on June 27, 1985. These payments cannot be said to have been in contemplation of bankruptcy simply because the possibility of bankruptcy did not appear to be an inevitable alternative at that time, at least not in the mind of Lonnie Kilpatrick. Clearly, none of the payments related to services rendered by Labozetta or his firm prior to the entry of the consent order would have been "in contemplation of bankruptcy" under the teachings of *Conrad, Rubin & Lesser, supra*. However, this is not true concerning the $50,000 received by Labozetta a few days prior to the filing of the Chapter 11 Petition for his efforts in attempting to forestall the State of Florida from revoking the securities registration of GIC which would have put GIC out of business. In spite of Labozetta's failure to disclose either in his submission or in his oral testimony that he received this $50,000.00, it is clear that GIC transferred $100,000 to Labozetta in April; that these monies were held by Labozetta in his escrow account ostensibly in connection with the transaction referred as as the Hampton deal and the same was the source of the $50,000.00 received by him shortly before bankruptcy. It should be noted that the payments disclosed by Labozetta in his written submission were not paid out of the $100,000 he received in April but was paid to him by GIC in addition to the $100,000 he received in April out of which he ultimately received $50,000 from Berlin. (Exhibit 52 to Lonnie Kilpatrick's Deposition).

The straw which broke the camel's back and caused a radical turn for the worse of the affairs of GIC came about because the office of the Comptroller resumed the investigation of the affairs of GIC in the

summer of 1985. The investigation reached such intensity that the operation of GIC was to reach the stage of complete paralysis. This intolerable state of affairs prompted Kilpatrick to call Labozetta and urge him to do something to keep the wolves away from the door. Labozetta insisted on an additional $100,000 fee in order to represent GIC in an attempt to stop the investigation by the office of the Comptroller and to avert what seemed at that point to be almost inevitable the revocation of GIC's registration as a securities dealer. Kilpatrick informed Labozetta in no uncertain terms that GIC did not have $100,000 to spend (Lonnie Kilpatrick's Deposition, Page 82, Lines 17–25). Labozetta, after having been unsuccessful in squeezing an additional $100,000 out of GIC, told Kilpatrick that he still had the original $100,000 received in April which was held by him in the escrow account and these monies could be used as "attorney fees". Kilpatrick agreed and authorized Labozetta to transfer the $100,000.00 to Berlin (Exh. 52 to Lonnie Kilpatrick's Deposition). Labozetta promptly followed through and wired the $100,000.00 to Berlin. At this point, it should be noted that under the consent decree, GIC was required to refund to the investors $4 million by August 1; $600,000 by September 1; $400,000 by October 1; and, by November 1, the balance. Thus, when the conversation referred to took place on August 28, in which Kilpatrick told Labozetta that GIC did not have $100,000 to spend, it became obvious that neither did GIC have the $600,000 which it was required to be paid under the consent decree on September 1 nor the $400,000 which would become due and owing on October 1, 1985. Based on these facts there is hardly any doubt that Kilpatrick knew that by virtue of Paragraph 8 of the consent order, in the event GIC failed to comply with any provisions of the consent order, the terms of the stipulation, the Comptroller was entitled to revoke the registration of GIC as a securities dealer without prior notice and hearing (Exhibit 10 to Deposition of Anthony Labozetta). Thus, the $50,000 payment, was clearly payment for services rendered by Labozetta in order to avoid bankruptcy thus in "contemplation" and, therefore, subject to re-examination pursuant to § 329 of the Bankruptcy Code and Bankruptcy Rule 2017.

### Fees Paid to Berlin

The connection of Berlin with the affairs of GIC is a horse of a different color. It is important to note at the outset that there is evidence in this record which indicates that Berlin was regarded as an experienced Florida real estate attorney and had no expertise in securities. Berlin was first contacted by Labozetta on behalf of GIC in the fall of 1983 for his advice in connection with GIC's potential purchase of a building in West Palm Beach, Florida (Deposition of Anthony Labozetta, Page 10, Line 11). Berlin was not contacted again by GIC until April 1985, when GIC took an appeal of the adverse order entered by the State of Tennessee revoking GIC's securities registration in that state and when the State of Florida, Office of Comptroller, began its revocation proceedings against GIC (Deposition of Lonnie Kilpatrick, P. 80, line 3. It appears that Berlin, who as noted earlier was not known for his expertise as a securities lawyer, but who was the Chairman of the Democratic Committee at that time, was contacted by GIC primarily for his actual or perceived political connections. There is evidence in this record through the deposition of Lonnie Kilpatrick and some documentation, that on August 20, 1985, GIC issued a series of checks which were mailed to Berlin, which checks appeared to have been issued to make campaign contributions to Senator Albert Gore of Tennessee. Obviously Senator Gore had nothing to do with the affairs of GIC and the conclusion is not without basis that the check issued to Senator Gore by GIC and transmitted through Berlin was for the purpose to obtain the Senator's assistance to help GIC through his political connections with the Tennessee authorities who were in charge of proceedings against GIC. It should also be noted that among those checks there were two checks, one to Malcolm Fromberg, the former Mayor of Miami, and to Bill Gunter (Deposition of Lonnie Kilpatrick, p. 81–83, Exh. 63), who was

at that time the State Insurance Commissioner. There is nothing in this record which warrants a finding that these checks were paid to these two Florida politicians for any reason other than to possibly use their influence with the Office of the Comptroller and help GIC with its even increasing problems. According to the testimony of Kilpatrick which is also indirectly supported by testimony of Labozetta, the transfer of the $100,000.00 to Berlin from the Hampton escrow fund was to be channeled to Gerald Lewis, obviously for the purpose of prevailing on Gerald Lewis to stop the investigation or at least to give a favorable consideration of GIC's attempts to survive as a dealer in securities through a moratorium. In fairness it should be noted that there is no hard evidence in this record which warrants a conclusion that Gerald Lewis, in fact, received any part of the $50,000.00 retained by Berlin out of the $100,000.00. Be that as it may, this is not really of any consequence. Whether or not Berlin kept these funds himself or actually paid some of it to the Comptroller or to Senator Gore or to the others is of no significance. This is so because it was clearly the intent of Kilpatrick when he authorized the transfer of the $100,000 to Berlin, the same to be used by whatever means it appeared to be necessary, to avoid bankruptcy by prevailing on the office of the Comptroller obtain a moratorium on its obligations to make the refund based on the consent decree. There is hardly any doubt that by the end of September this was the only viable alternative to GIC other than to seek relief in the Bankruptcy Court and invoke the protection of the automatic stay imposed by § 362. This is so notwithstanding Kilpatrick's protestations to the contrary. As noted earlier, in construing the term "in contemplation" in general, one is usually very much in contemplation of the very result he wants to avoid and when he engages services of an attorney to accomplish this goal and pays for such services, the payments are made "in contemplation". *Conrad, Rubin & Lesser, supra.*

Based on the foregoing, this Court is satisfied that the $50,000 received by La-bozetta ten days prior to the actual filing of bankruptcy and the same amount received by Berlin were, in fact, payments in contemplation of bankruptcy thus subject to re-examination by this Court.

Inasmuch as it appears that Labozetta voluntarily returned to the estate the $50,-000 he received out of the $100,000 transmitted to him by Berlin, the Trustee's request to re-examine that payment is moot and, therefore, no longer requires a consideration.

In light of the foregoing, it is

ORDERED, ADJUDGED AND DE-CREED that a final evidentiary hearing be, and the same is hereby, scheduled for the 12th day of December, 1988 at 9:00 a.m. to determine the reasonableness of the sum of $50,000 received by Berlin.

DONE AND ORDERED.