**In re Don Ray DIXON and Dana Dene Dixon, Debtors.**

**Dale WOOTTON, Trustee of Don Ray Dixon and Dana Dene Dixon, Plaintiff,**

v.

**William H. RAVKIND, Defendant.**

**Bankruptcy No. 387–33941 RCM–11. Adv. No. 387–3971.**

United States Bankruptcy Court, N.D. Texas, Dallas Division.

April 21, 1992.

## MEMORANDUM OPINION

ROBERT McGUIRE, Chief Judge.

The Trustee Dale Wootton ("Plaintiff") seeks to recover $300,000 from William H. Ravkind ("Defendant"), the attorney who performed primarily criminal defense services for the Debtor Don Ray Dixon ("Dixon"). The suit sought to recover the fees as a fraudulent conveyance. Defendant

1. At trial, Plaintiff stipulated that he was proceeding under § 548(a)(2), not § 548(a)(1).

2. In the event Defendant claims surprise, an additional status conference has been scheduled to permit Defendant to offer additional evidence, if he desires, to the issues addressed in this Memorandum Opinion. It appears that De-

has answered, and the matter was tried on March 18, 1992.

Plaintiff's cause of action is based on transfers of money and art paid an attorney, within one year of bankruptcy, for representation of Dixon in criminal investigations, trials, and appeals. While the transfers did occur within one year of the filing of the Chapter 11 bankruptcy petition of Dixon and Dana Dene Dixon (the "Debtors"), the more appropriate standard for review of those transactions is not under § 548, but rather under § 329 of the Bankruptcy Code (the "Code").[1] Services performed during the pendency of a case payable from property of the bankruptcy estate are reviewable under § 330 of the Code. See the discussion of fraudulent conveyance hereafter.

■ The Court is not limited in fashioning the appropriate relief. Bankruptcy Rule ("BR") 2017 entitles the Court *sua sponte* to challenge the excessiveness of any fees received by an attorney paid in contemplation of a debtor's bankruptcy filing, which it hereby does. The Court, after reviewing the pleadings and other evidence, determines that all but $35,000 of the payments received by Defendant were unauthorized and improper, and are subject to disgorgement under 11 U.S.C. §§ 329 and 330, and BR 2017, and alternatively, under 11 U.S.C. § 548(a)(2).[2]

### Factual Background

On April 22, 1987, the Debtors filed a voluntary Chapter 11 petition in California, which was then transferred to the Northern District of Texas. This adversary proceeding was filed October 14, 1987. By reason of a substitution of trustees and various other problems, the case was not tried until March 1992. Defendant was aware from September 1987 that his fee payment was being attacked.

fendant's counsel was already aware of the § 329 issue, and prepared to try it. *See,* Motion to Set Aside Entry of Default Judgment filed in this adversary proceeding by Defendant's counsel on December 11, 1987, and bearing docket entry number ("DE") 7.

Plaintiff is the duly appointed, qualified, and acting Trustee for the bankruptcy estate.

Defendant is a well-known attorney who specializes in the defense of federal white collar criminal charges.

Dixon had served as Chief Executive Officer of Dondi Financial Corporation, which, in turn, owned Vernon Savings and Loan Association.

In November 1986, Dixon was prominently described in the national media as being an alleged central figure in what is commonly called the savings and loan scandal. He had already received at least three letters from different United States Attorneys advising him that he was the target of a criminal investigation.

In November 1986, Dixon agreed to employ Defendant to represent him in all criminal matters which might arise out of his connection with Dondi Financial and Vernon Savings, for a flat fee of $450,000.

By modifications to that contract in December 1986, Defendant received $200,000 in cash and certain objects of art valued at $100,000, as payment in full.

At the time the fee agreement between Defendant and Dixon was entered into, no criminal charges were yet pending against Dixon. The professional services to be provided by Defendant were prospective in nature, and the transfer of funds to Defendant was not to secure a present or antecedent debt owed to Defendant by Dixon.

On June 13, 1990, more than three years after the filing of Debtors' voluntary Chapter 11 bankruptcy case, Dixon was indicted in the Northern District of Texas in CR3-90–149–G. Dixon has been indicted a second time on February 26, 1992, in 392–CR–089T.

Defendant defended Dixon in the first criminal trial, which ran from October 17, 1990 to December 20, 1990, and is currently on appeal.

Defendant credibly testified that he spent over 1,000 hours, post-petition in preparation for the Dixon trial. There were over 500,000 exhibits to be examined by Defendant, on Dixon's behalf, by the time of the criminal trial. The reasonable value for Defendant's services performed post-petition exceeded the amount he was paid. Pre-petition, Defendant was engaged in preparing for the defense of the criminal case, and participated in civil discovery with the FDIC.

Defendant did not keep time records nor did he place any part of the $200,000 cash or the $100,000 in art into a trust or escrow, but, upon receipt, treated the monetary transfer the same as his ordinary income. He deposited the cash in his operating account and disposed of same in his business. He disposed of the majority of the art that he received.

Because Defendant kept no time records, the hours he spent pre-petition on Dixon's behalf are difficult to calculate. It appears that Defendant spent in the range of 120–130 hours maximum pre-petition. If a lodestar were used, a reasonable rate for such hours would be $250–$275 per hour, given Defendant's qualifications and abilities. This would calculate to a pre-petition lodestar fee earned in the range of $30,000–$35,000.

There was credible testimony that a reasonable attorney in Dallas County, Texas, practicing criminal law, would not have undertaken the criminal representation of Dixon for less than $300,000. This fact was substantially undisputed. However, it needs to be kept in mind that the voluntary petition was filed April 22, 1987, and Dixon's criminal indictment was not until over three years later, i.e., June 13, 1990.

At all material times, the Debtors have been insolvent within the meaning of 11 U.S.C. § 548.

When Defendant received the money and art from Dixon, he knew of Dixon's proposed bankruptcy proceeding, and he and Dixon were concerned that Dixon's assets might shortly be seized by the government as part of a Racketeer Influenced and Corrupt Organizations ("RICO") seizure.

The money and art transferred by the Debtors to Defendant were not exempt properties of Dixon.

Of the art transferred to Defendant, the following art still remains in Defendant's possession, or under his or his law firm's control. (*See*, Plaintiff's Exhibit ("PX") 1):

| ARTIST | TITLE | SIZE |
|---|---|---|
| Oils | | |
| James Boren | Summer Home for a Cowboy | 22 × 29 |
| Grant McDonald | Fireflies | 10 × 12 |
| James Boren | Homeward Bound | 20 × 34 |
| Bronzes | | |
| Ken Ottinger | The Signal | |
| Karl Kauba | Small Indian | |

---

The present value of such art is speculative, but probably does not exceed $10,000. Other pieces of the art were sold for an unspecified amount, probably in the range of $15,000–$25,000. Defendant characterized all of the art as "cowboy art" which had limited appeal, and immediately declined in value after the date of the transfer.

The transfers to Defendant in cash and property, as a fee for Dixon's criminal representation, did not benefit the creditors of the Debtors generally, but served to deplete the assets which would later become assets of the bankruptcy estate.

While the transfer was disclosed on Debtors' schedules, Defendant failed to make a timely disclosure of the $300,000 fee, and his agreement with Dixon, as required by § 329(a) and Bankruptcy Rule 2016(b). Defendant refused and failed to file an application for an order approving his appointment when Dixon became a Debtor, as required by 11 U.S.C. § 327(e). Despite the straightforward language of § 327, no court approval was obtained to employ Defendant and pay him with bankruptcy estate funds. In addition, Defendant failed to notify the Debtors' creditors or the Court post-petition of his intention to make any distributions from any retainer as required by Local Rule 2016(b). Finally,

Defendant did not obtain post-petition Court approval of his use of the funds and art received to fund Dixon's criminal defense. 11 U.S.C. § 330.

Defendant does not practice regularly in the Bankruptcy Court, and claims no expertise in bankruptcy law. He apparently relied, to some extent, on the advice of the Debtors' earlier counsel, a California attorney experienced in bankruptcy law. Defendant acted in good faith, with no intention to mislead the Bankruptcy Court.

### Discussion

 *§ 329*—Under the Code, as under prior law, compensation of attorneys employed to render services in contemplation of or in connection with bankruptcy has always been the subject of close scrutiny. The statutory provisions are unambiguous. Attorney fees are subject to review by the court, notwithstanding the terms of any fee arrangement between an attorney and a debtor. Section 329(a) of the Code requires a debtor's attorney to file, with the court, a statement of the source and amount of the compensation paid or agreed to be paid to the attorney within one year of bankruptcy, for services rendered or to be rendered in contemplation of or in connection with a case under the Code.[3] Section 329(b) of the

---

**3.** A subjective and not an objective test applies in determining whether payments to attorneys were made "in contemplation of bankruptcy". The controlling question is the state of mind of the debtor, *i.e.*, whether, in making the transfer, the debtor is influenced by the possibility or imminence of a bankruptcy proceeding. *Con-*

*rad, Rubin & Lesser v. Pender*, 289 U.S. 472, 53 S.Ct. 703, 77 L.Ed. 1327 (1933); 2 *Collier on Bankruptcy* ¶ 329.03 at p. 329–14 (15th ed. 1991).

The Court, in *In re GIC Government Securities, Inc.*, 92 B.R. 525 (Bankr.M.D.Fla.1988), noted, in construing the term, "in contemplation",

Code and BR 2017 permit a court to cancel any agreement for payment of services, or order the return of compensation paid, if the payments exceed the reasonable value of the services provided. The standard of review under § 329 is based on reasonableness. If the court determines that the prepetition payments received by an attorney are excessive, the court may order a refund to the estate. 11 U.S.C. § 329(b). *In re Leff,* 88 B.R. 105 (Bankr.N.D.Tex.1988), *aff'd sub nom, Stewart v. Law Offices of Dennis Olson,* 93 B.R. 91 (N.D.Tex.1988), *aff'd,* 878 F.2d 1432 (5th Cir.1989); *Matter of Kroh Bros. Development Co.,* 120 B.R. 997 (Bankr.W.D.Mo.1989); *In re Office Products of America,* 136 B.R. 964 (Bankr. W.D.Tex.1992).

Both § 329 and BR 2017 were derived from § 60(d) of the Bankruptcy Act of 1898 (the "Act"). Their function, like their statutory predecessors, is to counteract "the temptation of a failing debtor to deal too liberally with his property in employing counsel to protect him from financial reverses." *Conrad, Rubin & Lesser v. Pender, supra; In re Wood and Henderson,* 210 U.S. 246, 28 S.Ct. 621, 52 L.Ed. 1046 (1908). In enacting § 329, Congress has reaffirmed the statement of policy set out in *Conrad, Rubin & Lesser v. Pender, supra. See,* H.R.Rep. No. 595, 95th Cong.

that one is usually "very much in contemplation of the very result he wants to avoid, and when he engages services of an attorney to accomplish this goal, is making payments in 'contemplation'." In *GIC,* the attorneys were hired on the eve of bankruptcy to forestall the State of Florida from revoking the securities registration of the debtor, which would have put it out of business.

Applying the subjective test to the transfers made to Defendant, the Court finds they were made in contemplation of bankruptcy. Prior to the filing of the bankruptcy proceedings, Dixon was the target of several major criminal investigations, and had received national media attention as an alleged central figure in the savings and loan scandal. At the time Defendant received the money and art as a payment from Dixon, both he and Dixon were concerned that Dixon's assets might be seized under a RICO seizure. Bankruptcy counsel had already been retained for the Debtors in California, and Debtors were insolvent. From the testimony adduced at trial, it was clear the cash payment and art represented part of the last liquid and available assets of the Debtors. At the time Defen-

1st Sess. 329 (1977), construed in *Collier on Bankruptcy* ¶ 329.01 at 329–2 ("Payments to a debtor's attorney provide 'serious potential' for both 'evasion of creditor protection provisions of the bankruptcy laws' and 'overreaching by the debtor's attorney.' ").

■ Viewed in isolation, it might appear from the language of § 329 that the Bankruptcy Court's authority to reexamine fee arrangements is limited to payments made to attorneys who actually represent the debtor in a case under Title 11, or who represented the debtor in connection with such a case. However, courts interpreting § 329 and BR 2017, along with their statutory predecessors, leave no doubt that it was Congress' intent to permit the courts to reexamine the reasonableness of fees within the one-year look back period, irrespective of the nature of the services rendered. The United States Supreme Court, in *Conrad, Rubin & Lesser v. Pender, supra,* 289 U.S. at 476, 477, 53 S.Ct. at 704, 705, interpreting § 60(d), stated:

[60(d) ] contains no intimation of an intention to limit the [Bankruptcy Court's] jurisdiction to reexamine [attorney fees] to a particular sort of legal services for the payment of which the debtor has disposed of his property.

dant was engaged, he undertook representation of Dixon in several criminal investigations, and related civil suits with the Federal Deposit Insurance Corporation (the "FDIC"). In addition, he participated with Dixon's California bankruptcy lawyers in some bankruptcy planning. At the time Defendant received the transfers of Dixon's money and property, Dixon's general counsel Simmons was parceling out funds and property for retainers. The Court finds that the transfers were received by Defendant within a year of the filing of bankruptcy, in contemplation of a bankruptcy proceeding, and that, therefore, the Defendant's fee arrangement is subject to review under § 329 of the Code. *See also, In re Rheuban,* 121 B.R. 368 (Bankr. C.D.Cal.1990), *rev'd in part on other grounds,* 124 B.R. 301 (C.D.Cal.1990), *on remand,* 128 B.R. 551 (Bankr.C.D.Cal.1991) (debtor acted "in contemplation of bankruptcy" when he entered into fee agreement for firm to represent him in connection with investigation and litigation of possible criminal and regulatory matters, arising out of debtor's business relationship with savings and loan).

Recent cases decided under § 329(a) of the Code have consistently interpreted it as broadly as § 60(d) of the Act. *See, Matter of Kroh Bros. Development Co., supra* (Bankruptcy Court ordered criminal defense attorney to remit $7,000 of $25,000 retainer on grounds it in excess of reasonable fee for services performed); *In re GIC Government Securities, Inc., supra.*

▇▇ Notwithstanding the fact Defendant did not represent Dixon in his Chapter 11 proceeding, Defendant's fee arrangement is subject to scrutiny under § 329(b) of the Code. Moreover, the fact Dixon and Defendant treated the retainer as a flat fee does not limit the Court's authority to review the reasonableness of the arrangement.

Various courts have considered whether flat fee arrangements are appropriate in a bankruptcy context. Those Courts generally have rejected the "reasonableness" of flat fee arrangements on the grounds they are contrary to the Bankruptcy Code and Rules; that they are inconsistent with the disciplinary rules governing attorney treatment of client funds; and that they conflict with policies inherent in Title 11 concerning professional compensation.[4]

▇▇ The reasonableness of an earned retainer is not based on whether such contract is permissible under state law, but rather whether it comports with the Code. It has been the practice in Texas and elsewhere to require pre-petition retainers taken for services to be rendered during the pendency of a bankruptcy case, to be held in trust, except to the extent that attorney fees are allowed by the court and ordered paid pursuant to 11 U.S.C. §§ 330 and 331. Such retainer taken prior to the filing of bankruptcy becomes the property of the bankruptcy estate upon commencement of the bankruptcy case, and is subject to the terms of a trust. *In re Office Products of America, supra; In re Leff, supra; In re*

*Chapel Gate Apartments, Ltd., supra* at 574; *In re Kinderhaus Corp.,* 58 B.R. 94, 97 (Bankr.D.Minn.1986); *In re NBI, supra;* In re C & P Auto Transport, Inc., supra.

The terms of the "trust" are defined by the Code, and its key provisions are generally summarized in *In re Chapel Gate Apts., Ltd., supra,* citing *Matter of Colin,* 44 B.R. 709 (Bankr.W.D.Mo.1984) as follows:

> The governing law obligates the court to see that the awards (of attorney's fees) are within reason and that they are in accordance with local standards respecting hourly rates and represent compensation for actual legal services which are necessary to the estate in bankruptcy ... (t)he provisions of § 331 ... which provide for the awarding of interim compensation quarterly to attorneys in bankruptcy proceedings, makes is clear that counsel are to be circumspect respecting exacting their fees in advance; that, in most imaginable instances, they should not collect awards of attorneys fees until they have actually been *earned and awarded by order of the Court.*

*In re Chapel Gate Apts., Ltd., supra* at 575. (Emphasis added).[5]

▇▇ Although the requirement of maintaining a retainer in trust is a matter of federal law, it is also consistent with state law. Under Texas law, a retainer remains property of the debtor until the attorney "applies it" to charges for services actually rendered. *In re Leff, supra; In re Office Products of America, supra.* Texas Code of Professional Responsibility, DR 9–102(A)(2) ("All funds of clients paid to a lawyer or law firm ... shall be deposited in one or more identifiable bank accounts ... and no funds belonging to the lawyer or law firm ... shall be deposited therein except.... [f]unds belonging in part to a client and in part presently or potentially to the lawyer or law firm....").

---

**4.** *In re C & P Auto Transport, Inc.,* 94 B.R. 682 (Bankr.E.D.Cal.1988); *In re NBI, Inc.,* 129 B.R. 212 (Bankr.D.Colo.1991); *In re Chapel Gate Apts., Ltd.,* 64 B.R. 569 (Bankr.N.D.Tex.1986); *contra* on "classic retainer": *In re McDonald Bros. Const. Co., Inc.,* 114 B.R. 989 (Bankr.

N.D.Ill.1990) (criticized in *NBI, Inc., supra* at 223 n. 11).

**5.** It is unnecessary in this opinion to discuss the conflict in authority over the applicability of local rates as opposed to rates in the locale of the attorney holding the retainer.

Because the debtor retains an equitable interest in the unearned portion of a pre-petition payment to counsel, such unearned portion becomes property of the estate under the Code, after the commencement of the case.[6]

 Defendant's fee arrangement is subject to review, under both §§ 329 and 330 of the Code, in that the payment was intended, and did serve as compensation for both pre-petition and post-petition services. *In re Office Products of America, supra.* That unearned portion of the payment became property of the bankruptcy estate upon the Debtors' bankruptcy. Post-petition compensation from the unearned portion of the payment is governed by § 330 of the Code. *Id.*

 Section 330 permits payment as an administrative expense for actual and necessary services and expenses. The main inquiry under § 330 is whether the post-petition services were necessary and benefitted the estate. This standard contrasts with § 329's reasonableness test. The distinction between the two standards is significant. Section 329 imposes no restriction on the nature of the services rendered, and places no requirement that they be beneficial to the estate to be compensable. By contrast, § 330 prohibits use of bankruptcy estate funds for any purposes other than the estate's benefit. *See, In re Office Products of America, supra. Stewart v. Law Offices of Dennis Olson, supra.*

Courts in this Circuit and elsewhere applying § 330 have generally refused to authorize the use of estate funds post-petition for payment of criminal counsel on the grounds that those expenses neither benefitted the estate, nor were actual and necessary to the estate. In applying § 330's strict standard, the courts required evidence that the services of criminal counsel were needed to prevent immediate harm to the estate or its property, dismissing hypothetical or speculative risks to the estate as insufficient. "Criminal counsel must not be potentially in the estate's interest, but reasonably and actually calculated to be in the best interest."[7] *In re Duque*, 48 B.R.

6. Though Texas ethical opinions have not prohibited flat fees as unethical *per se,* they have recommended that all client funds whose nature of ownership is subject to question be placed into a trust account and segregated from funds belonging entirely to the attorney. By its recommendation of a strict adherence to DR 9–102, Texas has followed the view advocated by the majority of the bar associations and courts which have issued opinions on the subject. Brickman, *The Advance Fee Payment Dilemma: Should Payments be Deposited to the Client Trust Account or to the General Office Account?,* 10 Cardozo L.Rev. 647, 650 (1989). ("By almost a 2:1 margin the [ethics] opinions provide that advance fee payments must be deposited to the trust account.").

Irrespective of how a retainer is labeled, it cannot be used as a device to circumvent those provisions of the disciplinary rules concerning the refundability of retainers and excessiveness of fees. Specifically, attorneys may be disciplined for refusing to refund unearned fees, DR 2–110(A)(3); and/or for charging excessive fees, DR 2–106. Texas Ethical Opinions 391 (1978) and 431 (1986); *Nolan v. Forman,* 665 F.2d 738 (5th Cir.1982), *reh'g denied,* 671 F.2d 1380 (1982); *Braselton v. Nicolas and Morris,* 557 S.W.2d 187 (Tex.Civ.App.—Corpus Christi 1977, no writ) ($18,000 flat fee charged for services rendered in connection with a divorce and property settlement reviewable for excessiveness under the standard of DR2–106). Other jurisdictions have addressed the ethical obligation of an attorney to return the unearned portion of a retainer. *In re NBI, Inc., supra* at 220, citing *People v. Gregory,* 797 P.2d 42 (Colo.1990) (violation of ethical duty to pay over client funds under DR2–110(A)(3) and DR9–102(B)(4) where attorney failed to refund advance fee that had not been earned because promised services not provided); *People v. Nichols,* 796 P.2d 966 (Colo. 1990) (attorney obligated pursuant to DR9–102(B) to return funds in his possession upon request of client entitled to refund of unearned retainer).

Because of Defendant's knowledge of the Debtors' impending bankruptcy filing and the possibility of a dispute as to the ownership of the funds, Defendant was ethically required to maintain the client funds in a trust account.

7. The Code itself specifically permits criminal proceedings to continue, notwithstanding the filing of bankruptcy. Section 362(b)(1) expressly permits the continuation or commencement of criminal proceedings. Legislative history of that provision states:

The bankruptcy laws are not a haven for criminal offenders, but are designed to give relief from financial over-extension. Thus, criminal actions and proceedings may proceed in spite of bankruptcy. (H.R.Rep. No. 595, 95th Cong., 1st Sess. 342 (1977),

965, 975 (S.D.Fla.1984); *Off. C. of Disputed Lit. Cr. v. McDonald Inv., Inc.*, 42 B.R. 981 (N.D.Tex.1984); *In re Tashof*, 33 B.R. 225 (Bankr.D.Md.1983).

■ The court in *Duque* analogizes the use of estate funds in support of a debtor's criminal defense to expenses incurred by a debtor in defending challenges to dischargeability. The weight of authority is that services rendered in preserving the debtor's discharge are for the purpose of exercising a personal privilege of the debtor rather than performing legal duties of the estate. Attorney fees for defending such actions are not compensable from the estate. *Matter of Jones*, 665 F.2d 60 (5th Cir.1982); *In re Weingarden*, 84 B.R. 691 (Bankr.S.D.Cal.1988); *In re Ryan*, 82 B.R. 929 (N.D.Ill.1987); *In re Cleveland*, 80 B.R. 204 (Bankr.S.D.Cal.1987).

■ Similarly, the expense of Dixon's criminal defense arising out of pre-petition criminal activity, like the expense of preserving a debtor's discharge, is personal to Dixon and of no interest to creditors, or of any benefit to the estate. *In re Duque, supra* at 970. In fact, the only thing the transfers to Defendant achieved was to further deplete the assets of the bankruptcy estate. Defendant suggests that his efforts benefitted the estate in that, but for his aggressive representation of Dixon, the government might have indicted Dixon under the RICO statute. A RICO claim might have resulted in claims of forfeiture of the Debtors' property, which would have applied to the estate. It is impossible to evaluate Defendant's claim of benefit since it is entirely conjectural in nature. Dixon was not indicted under RICO and the government's motivation in charging Dixon as it did is speculative at best. *In re Duque, supra.*

■ Defendant has suggested that even if it was not in the estate's best interest to employ him as criminal counsel, Dixon has a Sixth Amendment right entitling him to spend estate funds on his criminal defense. This argument is without merit. *In re Rheuban, supra*, 121 B.R. 368 (Bankr.C.D.Cal.1990); *Off. C. of Disputed Lit. Cr. v. McDonald Inv., supra.* The court, in *In re Rheuban, supra* at 384, succinctly states the majority view:

> The Court has made it clear that the Sixth Amendment only guarantees defendants in criminal cases the right to adequate representation, not representation by a particular attorney whom the defendant cannot afford. *Caplin & Drysdale v. United States*, 491 U.S. 617 [624], 109 S.Ct. 2646, 2652, 105 L.Ed.2d 528 (1989) (Federal drug forfeiture statute does not violate Sixth Amendment by requiring forfeiture of advance fee payment made to defendant's counsel).

The Sixth Amendment guarantees that Dixon will not be imprisoned after conviction if he has not had the assistance of counsel in his criminal proceeding. This entitles him to court-appointed counsel in the event he is unable to employ counsel. Dixon's Sixth Amendment right does not entitle him to any greater rights in Bankruptcy Court or any greater claims against the bankruptcy estate's assets. Even if Texas courts violated Dixon's Sixth Amendment right to counsel, Dixon's remedy would not be in the Bankruptcy Court—any remedy for a Constitutional violation would have to be brought in state or federal court. *Off. C. of Disputed Lit. Cr. v. McDonald Inv., Inc., supra* at 986–987; *In re Duque, supra.*

In sum, Defendant's fee arrangement is excessive and violates §§ 329 and 330 of the Code, and, on that basis, the Court orders the disgorgement of the remaining art on hand, $165,000 of the money received, and $90,000 representing the value of the art disposed of. At the additional

U.S.Code, Cong. & Admin.News 1978, pp. 5787, 6299).

The Eleventh Circuit has affirmed that intent:
The purpose of bankruptcy is to protect those in financial, not moral, difficulty. The bankruptcy courts were not created as a haven for criminals.

*In re Duque, supra* at 971, citing *Barnette v. Evans*, 673 F.2d 1250, 1251 (11th Cir.1982).

The fact the Code permits criminal proceedings to continue regardless of the automatic stay suggests the debtor-in-possession and trustee's duties, and the estate's property are unaffected by criminal proceedings.

**680**

status conference ordered herein, Defendant is to advise whether he wishes to offer more definitive testimony with respect to the credit for the value of the art ordered turned over.[8]

■ There is an independent and alternative basis for this Court's conclusion that Defendant must disgorge all but $35,000 of the fee received from Dixon to Plaintiff. Defendant refused or failed to timely make disclosure of the fee and agreement as required by § 329(a) and BR 2016(b). Defendant also refused or failed to file an application for an order approving his employment as special counsel by the Debtors, as required by 11 U.S.C. § 327(e). Defendant's refusal or failure to do either of the above independently constitutes grounds for ordering disgorgement of the fee. *In re Futuronics Corp.,* 655 F.2d 463 (2d Cir. 1981), *cert. denied,* 455 U.S. 941, 102 S.Ct. 1435, 71 L.Ed.2d 653 (1982) (denial of all compensation appropriate sanction for failure to comply with former Rule 215, predecessor to BR 2016(b)); *In re Whitman,* 51 B.R. 502 (Bankr.D.Mass.1985); *In re Kero–Sun, Inc.,* 58 B.R. 770 (Bankr.D.Conn. 1986); *In re Maller Restaurant Corp.,* 57 B.R. 72 (Bankr.E.D.N.Y.1985); *In re Meyer,* 50 B.R. 3 (Bankr.S.D.Fla.1985); *In re Land,* 116 B.R. 798 (D.Colo.1990), *aff'd,* 943 F.2d 1265 (10th Cir.1991).

### *Fraudulent Conveyance § 548(a)(2)*

Finally, even if this Court were to have found that the Defendant did not receive

transfers from Dixon for services rendered in contemplation of, or in connection with, the bankruptcy case, that would not change the result reached. Though the Court would then have lacked jurisdiction to review the reasonableness of the fees pursuant to § 329 of the Code, the Defendant's retainer would be vulnerable to disgorgement under § 548(a)(2).[9] *In re Habegger,* 139 F. 623 (8th Cir.1905); *In re Butcher,* 72 B.R. 447 (Bankr.E.D.Tenn.1987); *Quinn v. Union Nat. Bank,* 32 F.2d 762 (8th Cir. 1929).

■ Cases that have discusses the non-applicability of the fraudulent conveyance law to this type of transaction have generally done so first in the context of satisfying summary administrative relief under the predecessor to § 329 and the lack of necessity for a plenary suit, like a fraudulent conveyance suit. *Conrad, Rubin & Lesser v. Pender, supra; In re Wood and Henderson, supra. See, In re Rheuban, supra,* 124 B.R. 301, 303 (C.D.Cal.1990), *citing, In re Wood and Henderson, supra,* where the court stated: "... The legislative history of the section [§ 329] indicates that it was not intended as an action to set aside a fraudulent conveyance...." *In re Gherman,* 101 B.R. 367 (Bankr.S.D.Fla. 1989). Secondly, a fee permitted under § 329 is generally not subject to attack as a fraudulent conveyance under § 548. In *Quinn v. Union Nat. Bank, supra* at 765, the court stated:

> (B)(i) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
> (ii) was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or
> (iii) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured.

---

**8.** The Court earlier found that $35,000 of the payment had been earned by Defendant pre-petition. To the extent a portion of the fee payment was earned pre-petition, Dixon did not retain an equitable interest in same, and those funds did not become property of the bankruptcy estate. The remaining unearned portion, however, is property of the estate. *Stewart v. °Law Offices of Dennis Olson, supra.*

**9.** Section 548(a) provides in pertinent part:
(a) The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—
\* \* \* \* \* \*
(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

An attorney's fee allowed under this section [predecessor to § 329] is neither a preference nor a fraudulent conveyance if payment is for services rendered in contemplation of bankruptcy. *In re Wood and Henderson*, 210 U.S. 246, 28 S.Ct. 621, 52 L.Ed. 1046; *In re Rolnick* (C.C.A.) 294 F. 817.

 Debtors were insolvent on the date of the transfers. The elements of § 548(a)(2) have been proven, with the only issue remaining being the requirement that the transfer be for less than reasonably equivalent value. Dixon asserts that a contemporaneous exchange of value was given for the payment he made to Defendant, in that Defendant agreed, in exchange for the flat fee, to represent Dixon at all stages of the anticipated criminal proceeding. Plaintiff disagrees, insisting that Defendant's agreement to provide Dixon legal representation in a prospective criminal proceeding cannot constitute "reasonably equivalent value".

The term "value" is defined under § 548(d)(2)(A) of the Code to mean "property, or satisfaction or securing of a present or antecedent debt of the debtor, but does not include an unperformed promise to furnish support to the debtor or to a relative of the debtor". Under this definition, value "excludes future considerations, at least to the extent not actually performed." 4 *Collier on Bankruptcy* ¶ 548.07 at 548–77 (15th ed. 1987). At the time of the transfers, Debtors were not defendants, individually or collectively, in any criminal proceedings. In fact, Dixon was not even indicted until three years after the date of the bankruptcy filing. The services provided by Defendant were prospective in nature, and the transferred funds were not for the purpose of satisfying or securing a present or antecedent debt owed to Defendant by Dixon. Based on the prospective nature of the services sought, the Court agrees that the transfers to Defendant were for less than reasonably equivalent value.

Defendant did render services pre-petition, which the Court values at $35,000, and the Court finds he acted in good faith. The Court recognizes that Defendant retains an interest in the transfer to the extent he gave value and acted in good faith, and, consequently, voids the transfer only partially. 11 U.S.C. § 548(c). As the *Quinn v. Union Nat. Bank* court held, it appears that all but $35,000 is voidable under § 329, but if that conclusion is incorrect, then Defendant is protected under § 548(c) only to the extent of present consideration, *i.e.*, the services performed up to the filing of the bankruptcy petition.

The result in this case is very harsh. However, Defendant failed to timely make disclosure of the $300,000 fee and his agreement with Dixon, as required by § 329(a) and Bankruptcy Rule 2016(b); he failed and refused to file an application for an order approving his employment as required by § 327(e); no application was ever filed for approval of his fees. § 330. The case was filed April 22, 1987; he was aware of Plaintiff's complaint within five months thereafter.[10] Prior to the filing of the Complaint on September 10, 1987, Plaintiff's predecessor sent a letter to Defendant, certified mail, return receipt requested, demanding the return of the funds and all property received from Dixon pursuant to the fee agreement. Dixon was not indicted until three years after the petition was filed. Defendant had ample opportunity to see if his employment and fee arrangement would be approved by the Court substantially before Dixon's actual indictment. If Defendant had done this, he would have been paid for what he had already done, and presumably would not have undertaken further responsibility for which he could not be compensated. The "pure heart" standard does not protect Defendant. *In re Land*, 116 B.R. 798, 802 (Bankr.D.Colo.1990), *aff'd*, 943 F.2d 1265 (10th Cir.1991).

---

**10.** In Defendant's motion to set aside a default judgment filed December 11, 1987 (Docket Sheet, p.4, DE 7), he specifically showed his awareness of the Court's power to review his fees under § 329.