**In re Eugene H. PERRINE,
Jr., Debtor.**

**No. RS 05–13979 PC.**

United States Bankruptcy Court,
C.D. California,
Riverside Division.

April 13, 2007.

Kenneth J. Catanzarite, Anaheim, CA, for Debtor.

Thomas H. Casey, Rancho Santa Margarita, CA, for Chapter 7 Trustee.

## AMENDED MEMORANDUM DECISION

PETER H. CARROLL, Bankruptcy Judge.

Steven M. Speier, Chapter 7 Trustee ("Speier") seeks an order compelling Kenneth J. Catanzarite, Richard Vergel de Dios and the Catanzarite Law Corporation (collectively, "Catanzarite"), attorneys for Debtor, Eugene H. Perrine, Jr. ("Perrine") to disgorge undisclosed fees received by Catanzarite within one year before the filing of Perrine's bankruptcy petition allegedly "in contemplation of or in connection with" his bankruptcy case. Catanzarite objects to the disgorgement of the fees, claiming that the compensation was not received for services rendered either "in contemplation of or in connection with" Perrine's bankruptcy case. At the continued hearing, Kathleen Goldberg appeared for Speier and Richard Vergel de Dios appeared for Catanzarite and Perrine. The court, having considered Speier's motion and the opposition of Catanzarite and Perrine thereto, the evidentiary record, and arguments of counsel, makes the following findings of fact and conclusions of law [1] pursuant to Fed.R.Civ.P. 52, as incorporated into Fed. R. Bankr.P. 7052 and made applicable to contested matters by Fed. R. Bankr.P. 9014(c).

## I. STATEMENT OF FACTS

Prior to August 8, 2003, Perrine owned as his separate property a 30.32 acre tract of land located in Klamath Falls, Oregon ("Oregon Property"). On August 8, 2003, Perrine transferred the Oregon Property to the Eugene H. Perrine and Vicki L Perrine Family Trust dated August 8, 2003 ("Perrine Trust") by Trust Transfer Grant Deed recorded on August 22, 2003, at Volume M03, Page 61460, Real Property Records, Klamath County, Oregon.

The Perrine Trust is an *intervivos* revocable trust established in the name of Perrine and his wife, Vicki. Perrine is the trustor, co-trustee and beneficiary of the Perrine Trust. In addition to the Oregon Property, the assets of the Perrine Trust ostensibly included at its inception the following marital property:

> *Community Property:* "All items of tangible personal property, including, but not limited to, furniture and furnishings, silverware, clothing, books, collections of tangible personal property, and

---

1. To the extent that any finding of fact is construed to be a conclusion of law, it is hereby adopted as such. To the extent that any conclusion of law is construed to be a finding of fact, it is hereby adopted as such. On March 30, 2007, Perrine filed a Notice of Request by Debtor's Counsel for Additional Findings of Fact and Conclusions of Law Re: Memorandum Decision Filed and Entered March 23, 2007 ("Notice"). The court has supplemented its findings of fact in this Amended Memorandum Decision in response to the Notice to clarify the factual basis for the court's decision. Insofar as the additional findings of fact and conclusions of law set forth in the Notice have not been incorporated into this Amended Memorandum Decision, Perrine's request is denied.

other tangible personal property usually kept at the Trustor's residence."[2]

*Perrine's Separate Property:* (a) Real property and improvements located at 285 West Skyline Drive, La Habra Heights, California ("La Habra Property"), transferred into the Trust by Trust Transfer Grant Deed recorded on September 26, 2003, as Instrument No. 03–2864459, Official Records, Los Angeles County, California; (b) 50 shares of stock in Perrine Electric Company, Inc. and (c) a pension at Schwab & Company, Inc.[3]

Section 1.02 of the Perrine Trust states, in pertinent part:

"All property now or hereafter conveyed or transferred to the [Trust] ... shall remain, respectively, community property, quasi-community property, or the separate property of the Trustor transferring such property to the Trustee."

Perrine is also the president of Perrine Electric Company, Inc. ("Perrine Electric"). On April 29, 2004, Perrine was sued by AAA Electrical Supply, Inc. ("AAA") in Case No. BC 324665, styled *AAA Electrical Supply, Inc. v. Perrine Electric Company, Inc. and Eugene H. Perrine, Jr.*, in the Superior Court of Los Angeles County, for the sum of $71,167.05, plus attorneys fees and costs, based upon his personal guaranty of the debts of Perrine Electric. Catanzarite was the attorney of record for Perrine and Perrine Electric in the state court action.

On January 11, 2005, Perrine and Vicki Perrine, Individually and as trustee, executed a document entitled "Retainer Agreement and Application of In Kind Payment" agreeing to transfer the Oregon Property to Catanzarite at a stipulated value of $30,000 for payment of accrued attorneys fees and costs and as a credit for future attorneys fees and costs to be incurred by Perrine and Vicki Perrine. The Retainer Agreement states specifically that the payment is "for the purpose of securing the continued representation of the Trust and the individuals in future litigation including without limitation, with creditors and to protect the home equity of Vicki and the pension of Eugene." On January 13, 2005, Perrine and Vicki Perrine, as Co–Trustees of the Trust, executed a Statutory Bargain and Sale Deed conveying the Oregon Property to Kenneth J. Catanzarite for $30,000. The deed was recorded on January 14, 2005, at Volume M05, Page 03482, Real Property Records, Klamath County, Oregon. Ten days later, Perrine stipulated to entry of a judgment in the state court action in favor of AAA in the amount of $76,767.

On April 21, 2005, Perrine filed his voluntary petition under chapter 7 of the Bankruptcy Code.[4] Speier was appointed as trustee. In his schedules filed on May 6, 2005, Perrine disclosed assets valued at $415,740 and liabilities in excess of $174,073.[5] According to Schedule A, Per-

---

2. The Eugene H. Perrine Jr. and Vicki L. Perrine Family Trust Declaration of Trust, Schedule A.

3. *See* The Eugene H. Perrine Jr. and Vicki L. Perrine Family Trust Declaration of Trust, Schedule B.

4. Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1330 pri-

or to its amendment by the Bankruptcy Abuse and Consumer Prevention Act of 2005, Pub.L. 109–8, 119 Stat. 23 (2005). "Rule" references are to the Federal Rules of Bankruptcy Procedure ("Fed. R. Bankr.P."), which make applicable certain Federal Rules of Civil Procedure ("Fed. R. Civ.P.").

5. In Schedule F, Perrine listed 9 creditors holding unsecured non-priority claims totaling $174,073.53. According to Schedules D

rine did not own an interest in any real property on the petition date. Perrine's assets, as disclosed in Schedule B, consisted of cash, clothing, two vehicles, and his interest in a profit sharing plan valued at $400,000. Perrine declared under penalty of perjury that he neither owned stock or an interest in a business at the time of bankruptcy [6] nor any interest in a trust on the petition date.[7]

In his Statement of Financial Affairs filed on May 6, 2005, Perrine declared under penalty of perjury that he had not made any payments to creditors within 90 days preceding the commencement of the case [8] nor transferred any property (other than in the ordinary course of business or financial affairs of the debtor) within one year preceding the date of bankruptcy.[9] In response to Question # 9 of the Statement of Financial Affairs, Perrine disclosed that he had paid the sum of $3,000 to Catanzarite on January 14, 2005, for debt counseling or bankruptcy.

On May 6, 2005, Catanzarite filed a document entitled "Disclosure of Compensation of Attorney for Debtor" ("Rule 2016(b) Statement") signed by Richard Vergel de Dios on behalf of Catanzarite, stating:

> Pursuant to 11 U.S.C. § 329(a) and Fed. Bankr.P.2016(b), I certify that I am the attorney for the above-named debtor(s) and that compensation paid to me within one year before the filing of the petition in bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:

> | | |
> |---|---|
> | For legal services, I have agreed to accept | $3,000.00 |
> | Prior to the filing of this statement I have received | $3,000.00 |
> | Balance Due | $ 0.00 |

Mr. de Dios further certified that Catanzarite had agreed to accept $3,000 for the following legal services in the case:

> a. Analysis of the debtor's financial situation, and rendering advice to the debtor in determining whether to file a petition in bankruptcy;

> b. Preparation and filing of any petition, schedules, statements of affairs and plan which may be required;

> c. Representation of the debtor at the meeting of creditors and confirmation hearing, and any adjourned hearings thereof; [and]

> d. Representation of the debtor in adversary proceedings and other contested bankruptcy matters.[10]

Mr. de Dios's signature on the Rule 2016(b) Statement appears beneath the following certification:

> I certify that the foregoing is a complete statement of any agreement or arrangement for payment to me for representation of the debtor(s) in this bankruptcy proceedings.[11]

On May 23, 2005, Perrine appeared and was examined by Speier under oath at a meeting of creditors conducted pursuant to § 341(a).[12] Based upon the examination

---

and E, Perrine did not have any secured creditors or unsecured priority creditors on the petition date.

**6.** Schedule B, # 12.

**7.** Schedule B, # 19.

**8.** Statement of Financial Affairs, Question # 3.

**9.** Statement of Financial Affairs, Question # 10.

**10.** Rule 2016(b) Statement, p. 1.

**11.** Rule 2016(b) Statement, p. 2.

**12.** The Code requires a debtor to appear and submit to examination under oath at a meeting of creditors. 11 U.S.C. § 343; Fed. R.

and his investigation of Perrine's actions before bankruptcy, Speier filed a complaint in Adversary No. RS–05–01243 PC, styled *Steven M. Speier, Chapter 7 Trustee v. Vicki L. Perrine, et. al.*, on June 15, 2005, seeking, in part, to recover as a fraudulent conveyance funds received by Perrine from the sale of the La Habra Property prior to bankruptcy, which were then transferred to Vicki and used to purchase, as her separate property, certain real property located at 4025 Prarie Dunes Drive, Corona, California.

 On July 15, 2005, Perrine filed a motion to dismiss his case pursuant to § 707(a), alleging that Speier's fraudulent conveyance claims were unfounded and that the unsecured non-priority creditors holding claims in excess of $174,000 would not suffer significant legal prejudice by a dismissal of the case.[13] Perrine's dismissal motion was opposed by Speier and Perrine's largest creditor, AAA.[14] On August 15, 2005, the court denied Perrine's motion to dismiss finding that dismissal of the case would be prejudicial to creditors.[15] An Order Denying Debtor's Motion for Voluntary Dismissal of Case was entered on September 20, 2005. Shortly thereafter, Speier filed a complaint in Adversary

No. RS 05–01473 PC, styled *Steven M. Speier, Chapter 7 Trustee v. Eugene H. Perrine, Jr.*, objecting to Perrine's discharge pursuant to § 727(a)(2)(A), (a)(3), (a)(4)(A) and (a)(5).

On November 2, 2006, Speier filed a motion seeking an order compelling Catanzarite to amend its Rule 2016(b) Statement to disclose the transfer of the Oregon Property claiming that the property was received for services "in contemplation of or in connection with" Perrine's bankruptcy case. Perrine and Catanzarite opposed the motion, asserting that the fees incurred "in contemplation of or in connection with" the bankruptcy case were limited to the $3,000 disclosed in the Rule 2016(b) Statement on May 6, 2005, and that the Oregon Property was transferred to Catanzarite primarily for non-bankruptcy services. Catanzarite explained that there was an outstanding balance of $12,000 due the Catanzarite firm when it received the Oregon Property on January 14, 2005. After payment of the outstanding balance, the $18,000 credit was used to pay $3,000 in fees for preparation of the bankruptcy petition and "the remaining amount was used to pay fees incurred pre-bankruptcy related to the AAA Electric

---

Bankr.P.2003. The examination focuses on the debtor's acts, conduct, property, liabilities and financial condition, as well as any matter which might affect the administration of the bankruptcy estate and the debtor's right to a discharge. Fed. R. Bankr.P.2004(b).

**13.** In fact, Perrine's unsecured debt was substantially in excess of the amount disclosed in Schedule F. On January 13, 2006, Perrine filed an Amended Schedule F disclosing 12 holders of unsecured non-priority claims totaling $202,277.65.

**14.** On November 29, 2005, AAA filed a proof of claim in the amount of $76,767 based upon the Stipulation for Entry of Judgment entered in the state court action.

**15.** A debtor has no absolute right to dismiss a chapter 7 case. *Bartee v. Ainsworth (In re Bartee)*, 317 B.R. 362, 366 (9th Cir. BAP 2004); *Leach v. U.S. (In re Leach)*, 130 B.R. 855, 857 n. 5 (9th Cir. BAP 1991). In the Ninth Circuit, "a voluntary Chapter 7 debtor is entitled to dismissal of his case so long as such dismissal will cause no 'legal prejudice' to interested parties." *Leach*, 130 B.R. at 857. The debtor bears the burden of proving that dismissal will not prejudice creditors. *Bartee*, 317 B.R. at 366. In this case, Speier anticipated that there would be funds available to pay unsecured creditors, at least in part. Dismissal would have resulted in prejudice to creditors because there was no guarantee that Perrine would have paid their claims outside of bankruptcy. *Id.*

litigation."[16]

At a hearing on December 4, 2006, the court determined that Perrine's transfer of the Oregon Property to Catanzarite on January 14, 2005, within 97 days prior to the filing of Perrine's bankruptcy petition, was made "in contemplation of or in connection with" Perrine's bankruptcy case. Catanzarite was ordered to amend its Rule 2016(b) Statement to disclose all facts concerning its receipt of the Oregon Property. A hearing on the issue of disgorgement was continued to February 26, 2007.

On December 15, 2006, Catanzarite filed an Amended Disclosure of Compensation of Attorney for Debtor ("Amended Rule 2016(b) Statement"). Catanzarite's Amended Rule 2016(b) Statement did not mention the Oregon Property nor explain the method used by Catanzarite and Perrine to arrive at the $30,000 "stipulated" value. Catanzarite's Amended Rule 2016(b) Statement stated only that "payments and credits received from the Debtor in the amount of $30,000 were paid on behalf of the following categories: $21,000 in defense of the AAA Electrical litigation; $3,000 with regard to the dispute with MBNA, $3,000 for pension work and $3,000 for preparation of bankruptcy petition and schedules."[17] Prior to the continued hearing, Speier and Catanzarite filed supplemental memorandums of points and authorities on the issue of disgorgement. At the continued hearing on February 26, 2007, the matter was taken under submission.

## II. DISCUSSION

This court has jurisdiction over this contested matter pursuant to 28 U.S.C. §§ 157(b) and 1334(b). This matter is a core proceeding under 28 U.S.C.

16. Catanzarite's Opposition to Trustee's Motion to Compel Disclosure of Compensation and Disgorgement of Compensation for Failure to Disclose on Statement 2016, p. 3, l.6–10. In a letter to Speier's attorney, Thomas H. Casey dated December 15, 2005, Catanzarite enclosed a document entitled "Client Ledger Report" reflecting amounts billed to Perrine for legal services rendered by Catanzarite for the period from May 3, 2004 through April 26, 2005. In the letter, Catanzarite explained that the ledger report demonstrated that

"[A]s of December 22, 2004, the sum of $11,857.91 was due. After receipt and credit of the land transfer amount on January 13, 2005 for $30,000, there was an $18,000 credit balance. However, fees incurred pre-bankruptcy related to the then pending litigation, as through the statement dated April 26, 2005, consumed all but $1,040.44. The statement dated April 26, 2005 did not cover the services for the period of April 15, 2005 through April 20, 2005 .... the total amount accrued pre-petition was the sum of $2,615."

As such, on the date of petition, there was no credit balance. In fact, Perrine actually owed the firm approximately $1,600 at that point in time.

Trustee's Motion to Compel Disgorgement of Compensation for Failure to Disclose on Statement 2016, Ex. 10. In his statement of financial affairs, Perrine stated under penalty of perjury that he paid the $3,000 fee to Catanzarite on January 14, 2005. The Client Ledger Report does not contain a specific billing entry for the $3,000 fee disclosed in the Rule 2016(b) Statement nor is the absence of the entry explained in Catanzarite's letter of December 15, 2005.

17. Amended Rule 2016(b) Statement, p. 3, l.14–18. Catanzarite actually received payments and credits totaling $33,616.50 between April 22, 2004 and April 21, 2005, for legal services rendered and costs advanced on behalf of Perrine. This amount included the sum of $3,616.50 received by Catanzarite on August 18, 2004, for services rendered in conjunction with certain accounting and compliance issues that arose under a stipulated order concerning the division of a qualified retirement plan previously entered in Perrine's divorce case. At the hearing on December 4, 2006, the court determined that the sum of $3,616.50 was not paid to Catanzarite on August 18, 2004, in contemplation of Perrine's bankruptcy case.

§ 157(b)(2)(A), (B), (E) and (O). Venue is appropriate in this court. 28 U.S.C. § 1409(a).

## A. *Strict Duty of Disclosure*

 Section 329(a) requires a debtor's attorney to disclose to the court the amount of compensation paid or promised for services rendered "in contemplation of or in connection with the case."[18] Section 329(a) is implemented by Rule 2016(b) which requires the filing of the statement required by § 329(a) not later than 15 days after the order for relief.[19] Rule 2016(b) imposes a continuing duty on debtor's counsel to supplement the original statement pursuant to § 329(a).[20] The disclosure requirements of § 329(a) apply "whether or not the attorney ever applies for compensation. . . ." *Consumer Seven Corp. v. United States Trustee (In re Fraga)*, 210 B.R. 812, 822 (9th Cir. BAP 1997).

 Rule 2017(a) directs the court to determine, either *sua sponte* or upon motion by a party in interest, whether any payment or transfer of property to an attorney "in contemplation of" the filing of the bankruptcy petition is excessive.[21] Taken together, § 329(a) and Rule 2017(a) "furnish the court with express power to review payments to attorneys for excessiveness and to restore the status quo when assets have improvidently been bartered for legal services[.]" *In re Martin*, 817 F.2d 175, 180 (1st Cir.1987).

 Section 329's disclosure requirements are " 'mandatory, not permissive.' " *Turner v. Davis, Gillenwater & Lynch (In re Investment Bankers, Inc.)*, 4 F.3d 1556, 1565 (10th Cir.1993) (quoting *In re Bennett*, 133 B.R. 374, 378 (Bankr. N.D.Tex.1991)); *In re Keller Fin. Servs. of Fla., Inc.*, 248 B.R. 859, 883 (Bankr. M.D.Fla.2000). Section 329(a), which is derived from § 60(d) of the Bankruptcy Act of 1898,[22] seeks to prevent over-

18. Section 329(a) states:
Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.
11 U.S.C. § 329(a).

19. Rule 2016(b) provides:
Every attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 15 days after the order for relief, or at another time as the court may direct, the statement required by § 329 of the Code including whether the attorney has shared or agreed to share the compensation with any other entity. The statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of

the compensation with a member or regular associate of the attorney's law firm shall not be required. A supplemental statement shall be filed and transmitted to the United States trustee within 15 days after any payment or agreement not previously disclosed.
Fed. R. Bankr.P.2016(b).

20. *Id.*

21. Rule 2017(a) states, in pertinent part:
On motion by any party in interest or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money *or any transfer of property by the debtor,* made directly or indirectly and *in contemplation of the filing of a petition under the Code* by or against the debtor or before entry of the order for relief in an involuntary case, *to an attorney for services rendered or to be rendered is excessive.*
Fed. R. Bankr.P.2017(a) (emphasis added).

22. Section 60(d) of the Bankruptcy Act of 1898 provided:
If a debtor shall, directly or indirectly, in contemplation of the filing of a petition by

reaching by debtor's attorneys and serves to counteract " 'the temptation of a failing debtor to deal too liberally with his property in employing counsel to protect him in view of financial reverses and probable failure.' " *Conrad, Rubin & Lesser,* 289 U.S. at 477–78, 53 S.Ct. 703 (quoting *In re Wood,* 210 U.S. 246, 28 S.Ct. 621, 52 L.Ed. 1046 (1908)). Section 329(a) demands that an attorney be forthright in disclosing "the precise nature of the fee arrangement" with the debtor. *Neben & Starrett, Inc. v. Chartwell Fin. Corp. (In re Park–Helena Corp.),* 63 F.3d 877, 881 (9th Cir.1995) (quoting *In re Glenn Elec. Sales Corp.,* 99 B.R. 596, 600 (D.N.J.1988)). "Counsel's fee revelations must be direct and comprehensive. Coy or incomplete disclosures which leave the court to ferret out pertinent information from other sources are not sufficient." *In re Saturley,* 131 B.R. 509, 517 (Bankr.D.Me.1991).

▪ Congress intended to permit bankruptcy courts to reexamine the reasonableness of fees within the one-year look back period, irrespective of the nature of the services rendered. *See Keller Fin.*

*Servs.,* 248 B.R. at 878 (concluding that § 329 permits the court to review fees paid for services "performed at a time when the debtor was contemplating bankruptcy," regardless of the nature of the services (internal quotations omitted)); *Wootton v. Ravkind (In re Dixon),* 143 B.R. 671, 678 (Bankr.N.D.Tex.1992) (stating that § 329 "imposes no restriction on the nature of the services rendered . . ."); *Rheuban,* 121 B.R. at 378 (observing that § 329 does not limit the nature of the legal services that are subject to reexamination). Absent complete disclosure, the court is unable to make an informed judgment regarding the nature and amount of compensation paid or promised by the debtor for legal services in contemplation of bankruptcy.

▪ The failure to satisfy the disclosure requirements of § 329(a) and Rule 2016(b) may result in sanctions, "even if proper disclosure would have shown that the attorney had not actually violated any Bankruptcy Code provision or any Bankruptcy Rule." *Park–Helena Corp.,* 63 F.3d at 880; *Fraga,* 210 B.R. at 822. An attorney who violates § 329(a) and Rule 2016(b)

---

or against him, pay money or transfer property to an attorney and counselor at law, solicitor in equity, or proctor in admiralty for services to be rendered, the transaction shall be reexamined by the court on petition of the trustee or any creditor, and shall only be held valid to the extent of a reasonable amount to be determined by the court, and the excess may be recovered by the trustee for the benefit of the estate.

Bankruptcy Act of 1898, ch. 541, 30 Stat. 544, § 60(d), *superceded by* Bankruptcy Reform Act of 1978, Pub.L.No. 95–598, 11 U.S.C. § 329. In *Conrad, Rubin & Lesser v. Pender,* the Supreme Court discussed the scope of § 60(d), explaining:

It contains no intimation of an intention to limit the jurisdiction to re-examine to a particular sort of legal services for the payment of which the debtor has disposed of his property. The point of the provision conferring jurisdiction for a summary re-examination is not the specific nature of the

legal services to be rendered, but that the payment or transfer to provide for them is made "in contemplation of" bankruptcy. The purpose is shown by the sweeping description of payments or transfers "to an attorney and counselor at law, solicitor in equity, or proctor in admiralty."

289 U.S. 472, 476–77, 53 S.Ct. 703, 77 L.Ed. 1327 (1933) (quoting Bankruptcy Act of 1898, § 60(d)). This broad scope of review survives in the language of Rule 2017(a). *See In re Rheuban,* 121 B.R. 368, 376 (Bankr.C.D.Cal. 1990) (concluding that "decisions interpreting and applying predecessors of § 329 and Bankruptcy Rule 2017(a) remain persuasive and, in certain instances, are controlling . . . ."); *rev'd in part on other grounds,* 124 B.R. 301 (C.D.Cal.1990), *on remand,* 128 B.R. 551 (Bankr.C.D.Cal.1991); *In re GIC Gov't Sec., Inc.,* 92 B.R. 525, 530 (Bankr.M.D.Fla. 1988) (stating that "the principles enunciated by pre-Code cases interpreting § 60(d) of the Bankruptcy Act of 1898 are still controlling").

forfeits any right to receive compensation for services rendered on behalf of the debtor and may be ordered to disgorge fees already received. *See, e.g., Law Offices of Nicholas A. Franke v. Tiffany (In re Lewis)*, 113 F.3d 1040, 1045 (9th Cir. 1997) (concluding that "[a]n attorney's failure to obey the disclosure and reporting requirements of the Bankruptcy Code and Rules gives the bankruptcy court the discretion to order disgorgement of attorney's fees"); *Park–Helena Corp.*, 63 F.3d at 882 ("Even a negligent or inadvertent failure to disclose fully relevant information [in a Rule 2016 statement] may result in a denial of all requested fees."); *Jensen v. U.S. Trustee (In re Smitty's Truck Stop, Inc.)*, 210 B.R. 844, 849 (10th Cir. BAP 1997) (stating that an attorney's failure to disclose a retainer in his Rule 2016(b) statement is sufficient to deny all fees, even if the non-disclosure was negligent or inadvertent); *Fraga*, 210 B.R. at 822 ("The consequences of an attorney's violation of the disclosure requirements regarding fees include denial of all fees requested.").

## B. Services "In Contemplation of" the Bankruptcy Case

 Courts broadly apply a *subjective test* to determine whether attorneys fee payments were made "in contemplation of" bankruptcy. *Dixon*, 143 B.R. at 675 n. 3 (observing that "[a] subjective and not an objective test applies in determining whether payments to attorneys were made 'in contemplation of bankruptcy.'"); *Rheuban*, 121 B.R. at 378 (stating that a *"subjective* review [is] embodied in the 'in contemplation of' language of § 329 and its predecessors, § 60(d) and Bankruptcy Rule 220"). The subjective inquiry is "whether the debtor was influenced by the possibility or imminence of a bankruptcy proceeding in making the transfer." *Brown v. Luker (In re Zepecki)*, 258 B.R. 719, 724 (8th Cir. BAP 2001), *aff'd*, 277

F.3d 1041 (8th Cir.2002); *see Dixon*, 143 B.R. at 675 n. 3 (articulating the standard as "whether, in making the transfer, the debtor is influenced by the possibility or imminence of a bankruptcy proceeding"). The "controlling question," as the Supreme Court explained in *Conrad, Rubin & Lesser*, "is with respect to the state of mind of the debtor and whether the thought of bankruptcy was the impelling cause of the transaction." 289 U.S. at 477, 53 S.Ct. 703.

> If the payment or transfer was thus motivated, it may be re-examined and its reasonableness be determined. Undoubtedly, while the question thus relates to the debtor's motive, the nature of the services which he seeks and for which he pays may be taken into consideration as it may throw light upon his motive. It is not impossible that the services may have been so wholly separate from any exigency of bankruptcy as to indicate that the thought of bankruptcy was in no sense controlling. But, given the fact that the payment or transfer was in contemplation of bankruptcy, the inducement of the transaction affords, from the standpoint of the statute, sufficient ground for authorizing a summary inquiry into its reasonableness. The manifest purpose of the provision is to safeguard the assets of those who are acting in contemplation of bankruptcy, so that these assets may be brought quickly and without unnecessary expense into the hands of the trustee, and to provide a restraint upon opportunities to make an unreasonable disposition of property through arrangement for excessive payments for prospective legal services.

*Id.*

 Services aimed at the *prevention* of bankruptcy likewise necessarily contemplate bankruptcy, and compensation re-

ceived for such services falls within the ambit of § 329(a). *See, e.g., Conrad, Rubin & Lesser*, 289 U.S. at 479, 53 S.Ct. 703 (holding that the court had jurisdiction to review fees paid to an attorney retained by debtor to negotiate a 50% cash settlement with creditors prior to bankruptcy, and opining that "[a] man is usually very much in contemplation of a result which he employs counsel to avoid"); *Matter of Prudhomme*, 43 F.3d 1000, 1004 (5th Cir. 1995) (holding that evidence suggesting that the debtors, who in desperate financial straits, consulted an attorney for representation to restructure debt and resolve disputes with their largest creditor supported a finding that the fee was paid in contemplation of or in connection with the case); *In re Greco*, 246 B.R. 226, 231 (Bankr.E.D.Pa.2000) (holding that a $2,200 payment to an attorney two months before bankruptcy for legal research concerning the effect of bankruptcy on the debtor's student loans was "in contemplation of" bankruptcy); *Rheuban*, 121 B.R. at 379 (finding that debtor acted "in contemplation of bankruptcy" upon entering into a fee agreement with a firm to represent him in connection with investigation and litigation of possible criminal and regulatory matters arising out of debtor's business relationship with a savings & loan); *GIC Gov't Sec.*, 92 B.R. at 533 (concluding that payments made to attorneys retained on the eve of bankruptcy to resist efforts by the State of Florida to revoke the debtor's securities registration were "in contemplation of" bankruptcy). Those cases in which a debtor's counsel has received undisclosed non-exempt assets shortly before bankruptcy as compensation primarily for future services have merited particularly close scrutiny by bankruptcy courts.

In *Dixon*, an attorney, William H. Ravkind ("Ravkind") was employed by Don Ray Dixon ("Dixon") in November 1986, to represent him in criminal matters arising out of his association with Dondi Financial Corporation and Vernon Savings & Loan Association for a flat fee of $450,000. 143 B.R. at 673. Ravkind ultimately received $200,000 in cash and certain artwork valued at $100,000 as payment in full. *Id.* at 674. The cash and artwork, which were Dixon's non-exempt assets, were paid for future services to be rendered by Ravkind. *See id.* At the time he received the transfer, Ravkind was aware that Dixon was considering bankruptcy. *Id.* Ravkind and Dixon were concerned that the federal government was planning to seize Dixon's assets pursuant to the Racketeer Influenced and Corrupt Organizations Act.[23] *Id.* Ravkind immediately deposited the $200,000 cash in his operating account and used the funds to pay business expenses. *Id.* Ravkind then sold most of the artwork for less than $25,000. *Id.* at 675.

On April 22, 1987, Dixon filed a voluntary petition under chapter 11 of the Code. *Id.* at 673. Ravkind was not Dixon's general counsel in the bankruptcy case, but continued to represent him on criminal matters after the petition date. *Id.* at 674. Dixon disclosed the $300,000 transfer to Ravkind in his statement of financial affairs. *See id.* at 675. However, Ravkind failed to timely disclose the $300,000 fee and his agreement with Dixon pursuant to § 329(a) and Rule 2016(b). *Id.* Furthermore, Ravkind neither sought authorization to act as special counsel for Dixon under § 327(e) nor authorization to use any unearned portion of the $300,000 retainer in his possession. *Id.*

On October 14, 1987, Dale Wooten, as chapter 11 trustee, filed a complaint seeking to recover the $300,000 fee from Ravkind as a fraudulent transfer under

---

**23.** 18 U.S.C. § 1961, *et. seq.*

§ 548(a). *Id.* at 673. It was undisputed that at all material times, Dixon was insolvent within the meaning of § 548(a). *See id.* at 674. Ravkind had not kept time records, but the evidence supported a finding that he had earned approximately $35,000 for legal services rendered to Dixon prior to bankruptcy. *Id.* It was also undisputed that the reasonable value of Ravkind's post-petition criminal defense work, which accounted for the majority of his services to Dixon, exceeded the amount that he had been paid. *Id.*

Although relief was sought by the trustee under § 548(a), the bankruptcy court concluded that "the more appropriate standard" for review of Ravkind's fee arrangement with Dixon was § 329(a) and § 330. *Id.* at 673. Applying a subjective test, the bankruptcy court found that Dixon's $300,000 transfer to Ravkind was made in contemplation of bankruptcy, stating:

> Prior to the filing of the bankruptcy proceedings, Dixon was the target of several major criminal investigations, and had received national media attention as an alleged central figure in the savings and loan scandal. At the time [Ravkind] received the money and art as a payment from Dixon, both he and Dixon were concerned that Dixon's assets might be seized under a RICO seizure. Bankruptcy counsel had already been retained for the Debtors in California, and Debtors were insolvent. From the testimony adduced at trial, it was clear the cash payment and art represented part of the last liquid and available assets of the Debtors. At the time [Ravkind] was engaged, he undertook representation of Dixon in several criminal investigations, and related civil suits with the Federal Deposit Insurance Corporation (the "FDIC"). In addition, he

participated with Dixon's California bankruptcy lawyers in some bankruptcy planning. At the time [Ravkind] received the transfers of Dixon's money and property, Dixon's general counsel Simmons was parceling out funds and property for retainers. The Court finds that the transfers were received by [Ravkind] within a year of the filing of bankruptcy, in contemplation of a bankruptcy proceeding, and that, therefore, [Ravkind's] fee arrangement is subject to review under § 329 of the Code.

*Id.* at 675 n. 3. The court then ordered Ravkind to disgorge all but $35,000 of the payment received from Dixon, *i.e.*, the remaining art on hand, $160,000 of the cash received, and $90,000 representing the value of the artwork disposed of, finding that the fee arrangement was excessive and violated § 329 and § 330. *Id.* at 679. The court also determined that Ravkind's failure to disclose the $300,000 fee and agreement with Dixon pursuant to § 329(a) and Rule 2016(b) constituted "an independent and alternative basis" for disgorgement of the fees. *Id.* at 680. In ordering the disgorgement, the court concluded that Ravkind's criminal defense work was personal to Dixon and resulted in no benefit to creditors or the estate, stating "the only thing the transfers to [Ravkind] achieved was to further deplete the assets of the bankruptcy estate." *Id.* at 679.

In *Zepecki,* Robert Zepecki ("Zepecki") filed a voluntary chapter 7 petition on February 7, 1996. 277 F.3d at 1043. Three months earlier, Zepecki's attorney, Steven C.R. Brown ("Brown") had received the net proceeds of $102,989 from the sale of certain real property owned by Zepecki in Illinois pursuant to a "1031 Exchange of Property Escrow Agreement."[24] *Id.* at 1044. Acting as escrow agent under the

---

**24.** Zepecki sought avoid capital gains on the sale of the Illinois property by effectuating a

tax-free exchange of property under § 1031 of the Internal Revenue Code. 26 U.S.C. § 1031.

agreement, Brown disbursed the sum of $65,000 to the bank account of a third party, Ted Holder ("Holder") prior to Zepecki's bankruptcy. *Id.* The balance was disbursed by Brown to Holder shortly after the petition date. *Id.* Brown received $40,000 in attorneys fees as part of the transaction, $20,000 following each payment to Holder. *Id.*

Zepecki failed to disclose in his schedules and statements either the sale of the Illinois property or the transfer of the sale proceeds to Brown. *Id.* at 1043. The bankruptcy court denied Zepecki's discharge under § 727(a)(4), and *sua sponte* ordered Brown to account for the $40,000 fee received under the agreement. *Id.* at 1043–44. Brown documented attorneys fees and expenses totaling $7,160 incurred prior to Zepecki's bankruptcy in conjunction with the tax-free exchange. *Id.* at 1044. Ultimately, the bankruptcy court determined that the $40,000 fee was paid to Brown in contemplation of or in connection with Zepecki's bankruptcy. *Id.* at 1046. Brown was ordered to disgorge fees of $32,840 to the estate, representing the entire post-petition fee of $20,000 and $12,840 of the $20,000 fee received prior to the petition date. *Id.* at 1044. Brown appealed and the Bankruptcy Appellate Panel for the Eighth Circuit affirmed. *Zepecki*, 258 B.R. at 726. The Eighth Circuit then affirmed the judgment of the Bankruptcy Appellate Panel, holding:

> We also find no clear error in the bankruptcy court's finding that Brown's representation was in connection with or in contemplation of the possibility or imminence of a bankruptcy proceeding. The Illinois land transaction occurred within one month after Zepecki's divorce from Ms. Kania, who was Zepecki's largest

creditor, and within four months prior to the bankruptcy filing. The proceeds of the land sale constituted Zepecki's largest asset with which to satisfy Ms. Kania's judgment. The bankruptcy court found that the land transaction was a sham and was performed in an effort to prevent the asset from becoming property of Zepecki's bankruptcy estate and prevent his ex-wife from recovering on her judgment. Zepecki lost his right to a bankruptcy discharge because he failed to identify the transaction or its proceeds on his bankruptcy schedules, which further supports the court's conclusion that Zepecki was trying to keep the asset from his wife. These facts support the bankruptcy court's conclusion that Zepecki was contemplating bankruptcy when he transferred the Illinois property and when Brown assisted in the attempted section 1031 transfer of that same property.

*Zepecki*, 277 F.3d at 1046.

C. *Perrine Transferred the Oregon Property to Catanzarite In Contemplation of Bankruptcy*

▉ As the Supreme Court explained in *Conrad, Rubin & Lesser*, the test for determining if a payment or transfer was made "in contemplation of" bankruptcy hinges upon the debtor's state of mind and, more precisely, "whether the thought of bankruptcy was the impelling cause of the transaction." 289 U.S. at 477, 53 S.Ct. 703. Four months prior to bankruptcy, Perrine was embroiled in a lawsuit with AAA, his largest creditor. On the eve of trial, Perrine transferred the Oregon Property from the Perrine Trust to his attorney, Catanzarite. The Perrine Trust specifically provided that the Oregon Property remained Perrine's separate property,

---

The parties to the 1031 Exchange of Property Escrow Agreement drafted by Brown included Zepecki, B & B Diversified Resources, Inc., Zepecki's closely held corporation, Brown, and the purchaser of the real estate identified as James Burch. *Zepecki*, 277 F.3d at 1044.

notwithstanding its inclusion in the trust. The Oregon Property was Perrine's last and most significant non-exempt asset. At the time of the transfer, Catanzarite and Perrine had to have been concerned that the Oregon Property would be seized by AAA to satisfy any judgment that might be entered against Perrine in the state court action. Catanzarite concedes that once it received the Oregon Property, there was "no property remaining in the trust to satisfy creditors." [25] With the Oregon Property in the hands of Catanzarite, Perrine stipulated to a judgment with AAA ten days later.

Moreover, the language of Catanzarite's retainer agreement belies any notion that the Oregon Property was not transferred in contemplation of bankruptcy. Like *Dixon,* the transfer was intended to barter non-exempt assets primarily for future legal services to be rendered by Catanzarite. Perrine transferred the Oregon Property to Catanzarite 97 days prior to his bankruptcy, after exhausting efforts to litigate with his largest creditor, and for the stated purpose of "securing the continued representation of the Trust and the individuals in future litigation including without limitation, with creditors and to protect the home equity of Vicki and the pension of Eugene." [26] The Oregon Property was given a "stipulated" value of $30,000 by Perrine to Catanzarite, but Catanzarite was owed only $12,000 at the time of the transfer. As in *Dixon,* the effect of the transfer was to further deplete the assets of the estate.

Catanzarite argues that Perrine did not contemplate or intend to file bankruptcy at the time he was sued by AAA on April 29, 2004.[27] The critical date, however, is the date of the transfer of the Oregon Property. The only direct evidence of Perrine's state of mind on January 14, 2005, is Perrine's deposition testimony that he "never really wanted to declare bankruptcy" and, in response to a question as to whether he was thinking about filing bankruptcy in January 2005, Debtor responded "I don't know." Even Perrine's deposition testimony lacks credibility when weighed against the facts as they existed 97 days prior to bankruptcy.

At the hearing on December 4, 2006, Catanzarite conceded that Perrine "wanted to avoid bankruptcy." Catanzarite explained that Perrine's business "operated from one large job to another," and that his client had been "down in the hole before" but he would receive "the golden phone call ... where it was a big job would come in and it, pull his company out of its abyss, financial abyss." Taken together, these facts support a finding that Perrine was contemplating the possibility or imminence of bankruptcy when he transferred the Oregon Property to Catanzarite on January 14, 2005, and that the transfer is subject to review under § 329(a) and Rule 2017(a).

D. *Catanzarite Failed to Disclose Property Transferred to Catanzarite in Payment for Legal Services Rendered, or To Be Rendered, in Contemplation of Perrine's Bankruptcy Case*

Section 329(a) and Rule 2016(b) required that Catanzarite's disclosures be

---

**25.** Reply in Support of Supplemental Memorandum of Points and Authorities in Support of Reasonableness of Fees Incurred By Catanzarite Law Corporation, p. 3, l.19–20.

**26.** Retainer Agreement and Application of In Kind Payment, executed on January 11, 2005, Eugene H. Perrine and Vicki L. Perrine, Individually and as Trustee and Kenneth J. Catanzarite, Individually and as President of Catanzarite Law Corporation.

**27.** Opposition to Trustee's Motion to Compel Disclosure of Compensation and Disgorgement of Compensation for Failure to Disclose on Statement 2016, p. 2, 23–24.

full, candid and complete. Catanzarite timely filed a Rule 2016(b) Statement in this case, but failed to disclose fully and candidly in its Rule 2016(b) Statement the precise nature of its fee agreement with Perrine. Catanzarite's failure to disclose its complete relationship with Perrine was neither negligent or inadvertent. Notwithstanding its receipt of the Oregon Property pursuant to its retainer agreement with Perrine, Catanzarite made a purposeful calculation of the amount that it chose to disclose in its Rule 2016(b) Statement. Catanzarite did not receive the sum of $3,000 from Perrine for legal services, as certified in its Rule 2016(b) Statement. On the contrary, Catanzarite received a transfer of the Oregon Property from the Perrine Trust on January 14, 2005, with a stipulated value of $30,000. Catanzarite then apportioned a value of $3,000 from the $30,000 transfer for legal services ostensibly rendered to Perrine in contemplation of or in connection with his bankruptcy case. No facts concerning Catanzarite's retainer agreement nor its receipt of the Oregon Property 97 days prior to bankruptcy were disclosed in either the Rule 2016(b) Statement or the Amended Rule 2016(b) Statement. Nor did Catanzarite disclose the method used to calculate the $30,000 "stipulated" value of the Oregon Property. Neither the retainer agreement nor the transfer of the Oregon Property to

Catanzarite were disclosed by Perrine in the statement of financial affairs prepared by Catanzarite and filed with the court.

An attorney who neglects to satisfy the disclosure requirements of § 329(a) and Rule 2016(b), whether willfully or inadvertently, forfeits any right to receive compensation for services rendered on behalf of the debtor and may be ordered to return fees already received. *See Keller Fin. Servs.*, 248 B.R. at 885 (stating that "[t]here are no measurable damages which result from the non-disclosure of compensation required by § 329"). Given the gravity of Catanzarite's non-disclosure, the court will deny all fees to Catanzarite for legal services rendered to Perrine to the petition date due to its failure to comply with § 329(a) and Rule 2016(b).[28] Catanzarite will be ordered to disgorge and turn over to Speier either the Oregon Property or its stipulated value of $30,000, at the election of the trustee, for the benefit of the estate.

## III. CONCLUSION

Ninety-seven days prior to bankruptcy, Perrine transferred the Oregon Property to Catanzarite for legal services rendered, or to be rendered, in contemplation of his bankruptcy case. Catanzarite's failure to disclose both its retainer agreement with Perrine and its receipt of the Oregon

---

**28.** In reaching its conclusion, the court makes no finding as to the reasonableness of the fees sought by Catanzarite for legal services rendered on behalf of Perrine prior to bankruptcy. *See Lewis*, 113 F.3d at 1046 (holding that where non-disclosure results in an order for disgorgement of all fees, an inquiry into the appropriate amount of the fee is not required). The court notes, however, that the bulk of Catanzarite's pre-petition fees were incurred defending Perrine in the AAA litigation for which Catanzarite ultimately disclosed a fee of $21,077.93. Under § 329(b), Catanzarite bore the burden of establishing the reasonableness of its fees. *Hale v. United*

*States Trustee (In re Basham)*, 208 B.R. 926, 931–32 (9th Cir. BAP 1997) (stating that "[t]he burden is on the applicant to demonstrate that the fees are reasonable"). The court questions the reasonableness of Catanzarite's fee for the AAA litigation, particularly in light of the results obtained. AAA sued Perrine for $71,167.05, plus interest, attorneys fees and costs. The AAA litigation was concluded with a stipulated judgment for $75,000–10 days after Catanzarite received the Oregon Property. Moreover, Catanzarite admitted that, at the time of the transfer, fees attributable to the AAA litigation were only $12,000.

Property pursuant to such retainer agreement, as mandated by § 329(a) and Rule 2016(b), warrants disgorgement of the Oregon Property and denial of fees.

A separate order will be entered consistent with this opinion.